Benjamin ROMERO and Maria Guallpo,
Plaintiffs,

v.

WEST BEND MUTUAL INSURANCE COMPANY and
Badger State Auto Auction, Inc.,
Defendants-Respondents,†

ADDISON INSURANCE COMPANY, Defendant-Appellant,

FORD MOTOR COMPANY and TJL Properties, LLC,
Defendants.

Kyle S. WITZ, Plaintiff,

v.

WEST BEND MUTUAL INSURANCE COMPANY and
Badger State Auto Auction, Inc.,
Defendants-Respondents,†

FORD MOTOR COMPANY, Defendant,

ADDISON INSURANCE COMPANY, Defendant-Appellant.

George KUCHARAS and Lynn Kucharas, Plaintiffs,

v.

WEST BEND MUTUAL INSURANCE COMPANY and
Badger State Auto Auction, Inc.,
Defendants-Respondents,†

---

† Petition for Review Filed.

ADDISON INSURANCE COMPANY, Defendant-Appellant,

FORD MOTOR COMPANY, Blue Cross Blue Shield of Wisconsin, American Family Mutual Insurance Company and Dairyland Insurance Company, Defendants.

Court of Appeals

No. 2014AP2882. Submitted on briefs October 28, 2015. —Decided July 13, 2016.

2016 WI App 59

480

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Kay Nord Hunt* of

*Lommen Abdo, P.A.* of Minneapolis, Minnesota, and *Patrick W. Brennan* and *Sarah Fry Bruch* of *Crivello Carlson, S.C.* of Milwaukee.

On behalf of the defendant-respondent West Bend Mutual Insurance Company, the cause was submitted on the brief of *Jeffrey Leavell* and *Danielle N. Rousset* of *Jeffrey Leavell, S.C.* of Racine.

On behalf of the defendant-respondent Badger State Auto Auction, Inc., the cause was submitted on the brief of *Eric S. Darling* and *Benjamin E. Reyes* of *Schmidt, Darling and Erwin* of Milwaukee.

Before Reilly, P.J., Gundrum and Hagedorn, JJ.

¶ 1. HAGEDORN, J. This case is an insurance dispute between Addison Insurance Company and West Bend Mutual Insurance Company. The dispute arose when an employee of Badger State Auto Auction, Inc. (BSAA) injured the plaintiffs while driving a vehicle it was preparing to auction off for Fairview Auto, Inc. Addison insures Fairview and West Bend insures BSAA.

¶ 2. The primary issue is whether Fairview's policy with Addison covered the accident. The circuit court concluded it did, resting in part on the conclusion that the BSAA driver was acting as Fairview's agent at the time of the accident. We reverse and conclude that the BSAA driver was not acting as Fairview's agent. Accordingly, Addison's policy did not cover the accident.

## I. BACKGROUND

¶ 3. This case comes before us on summary judgment; the material facts are not in dispute.

*Fairview, BSAA, and the Accident*

¶ 4. Fairview is a corporation owned and operated by Jeffrey Boe. Fairview's entire business consists of buying vehicles at auctions and selling them at other auctions for a profit. Fairview has long used BSAA to sell its cars. At the time of the accident, Fairview had a policy with Addison, and BSAA had a policy with West Bend.

¶ 5. On August 22, 2011, Fairview purchased a 2002 Ford Explorer from an auction in Schofield, Wisconsin. Fairview then arranged for the Explorer to be sold at BSAA's August 25, 2011 auction. Fairview had control over certain parts of the auction process, but most policies and procedures were dictated by BSAA. Regarding the sale itself, Fairview could instruct BSAA whether the vehicle was being sold "as is" or as "auction guaranteed." Instead of giving BSAA a minimum price, Boe would usually stand at the auction block and inform the auctioneer whether to sell the vehicle or not.

¶ 6. BSAA, as part of its normal services, drove the Ford Explorer from Fairview's place of business to BSAA's auction. At the auction house, BSAA would assign each vehicle a parking spot and a lane to travel in. BSAA also offered services such as detailing and repairing vehicles. Once a vehicle was on BSAA's auction site, potential buyers could request a test drive. When the auction began, a BSAA driver would retrieve the vehicle from its designated spot and follow a route designated by BSAA into the auction house where the auction would be conducted. Fairview had no input, supervision, or control over the hiring or training of drivers, the particular routes used inside

484

the auction house, the safety procedures employed by BSAA drivers, or the management of foot traffic in the auction house.

¶ 7. On August 25, 2011, BSAA employee Francis Yeager was driving vehicles for that day's auction. He was the person tasked with driving Fairview's Ford Explorer into the auction house. While doing so, he struck plaintiff Benjamin Romero. Romero suffered severe injuries that resulted in the amputation of his right leg and part of his left hand. According to the complaints, plaintiffs George Kucharas and Kyle Witz also suffered injuries. At the time of the accident, Boe was inside the auction house waiting for his vehicles to enter so that he could take his place next to the auctioneer.

## Addison's Policy

¶ 8. Addison's policy provided primary liability insurance for any covered auto[1] Fairview owned. It contained both a Garage Coverage Form and a Wisconsin-specific endorsement, the Wisconsin Changes Endorsement.

¶ 9. The Garage Coverage Form provides the default coverage under Addison's policy and applies unless modified by the Endorsement. It defines "Who Is An Insured" to include the policyholder and, with several exceptions, "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow." One of the exceptions to coverage is "[s]omeone using a covered 'auto' while he or she is working in a business of selling, servicing, repairing, parking or storing 'autos' unless that business is your 'garage operations.' "

---

[1] Addison does not dispute that the Ford Explorer was a covered auto under its policy.

¶ 10. The Endorsement reads: **"THIS EN-DORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY."** The Endorsement states that "[f]or a covered 'auto' licensed or principally garaged in, or 'garage operations' conducted in, Wisconsin, the coverage form is changed as follows." The original policy language remained operative "unless modified by the endorsement."

¶ 11. The Endorsement provided in pertinent part:

**A. Changes In Liability Coverage**

. . . .

2. If your business is selling, servicing, repairing or parking "autos", Who Is An Insured is changed to include anyone other than an officer, agent or "employee" of such business while using a covered "auto." However, that person is an "insured" only if he or she has no other valid and collectible insurance with at least the applicable minimum limit specified by WIS. STAT. [§]344.01(2)(am) . . . .

. . . .

3. The following is added to **Who Is An Insured**:

Anyone else is an "insured" while using a covered "auto" you own with your or any adult "family member's" permission.[2]

---

[2] Section A.1 of the Endorsement applies "if your business is other than selling, servicing, repairing or parking 'autos.' " Section A.4 of the Endorsement references and replaces specific provisions of Who Is An Insured. Section A.5 modifies the Fellow Employee Exclusion.

## The Litigation

¶ 12. Following the accident, Romero, Kucharas, and Witz each filed separate personal injury lawsuits stemming from their injuries. The three cases were consolidated into a single case for discovery and trial. Romero's claim was mediated and the parties eventually settled his claim for $5 million. Addison was kept informed of the settlement negotiations and refused to contribute to the settlement. West Bend paid the settlement and acquired Yeager and BSAA's rights under Fairview's policy with Addison.

¶ 13. West Bend then filed a cross-claim against Addison asserting that Yeager was an insured under Addison's policy. West Bend also maintained that Addison's policy was primary and that Addison breached its duty to indemnify by refusing to contribute to the settlement. Because of this alleged breach, West Bend claimed that it was entitled to reimbursement of $1 million—the limits of Addison's policy—plus the costs and attorneys' fees incurred in pursuing the claim against Addison. For its part, Addison denied that Yeager and BSAA were insureds under its policy. Both Addison and West Bend moved for summary judgment.

¶ 14. The circuit court granted West Bend's motion for summary judgment, finding that it did not make a difference whether section A.2 or A.3 of the Endorsement applied to the accident because Yeager and BSAA would be covered under either provision. It concluded that section A.2 excepted agents from its limitations on coverage, and that Yeager and BSAA were agents of Fairview and therefore entitled to coverage. The court also found that Yeager and BSAA would be covered under section A.3 of the Endorsement

487

because A.3 provided coverage to any permissive user, and Yeager was using Fairview's Ford Explorer with its permission.

¶ 15. The court further held that Addison's policy was primary and that it breached its duty to indemnify by refusing to contribute to the settlement with Romero. As a result, the court ordered Addison to pay its policy limits of $1 million, and awarded West Bend its expenses and reasonable attorneys' fees incurred in litigating the coverage issue. Addison filed a motion for relief pending appeal seeking a stay of enforcement. The circuit court granted Addison's motion for stay but required it to pay a $1.2 million bond payable to West Bend pursuant to Wis. Stat. § 808.07(2m)(a) (2013–14).[3] Addison appeals the underlying coverage determination, the award of fees and costs, and the propriety of the required appeal bond.

## II. DISCUSSION

¶ 16. Contrary to the circuit court, we adjudge that section A.2 of the Endorsement is the provision applicable to the accident, not the Garage Coverage Form or section A.3 of the Endorsement. Section A.2 limits coverage for "anyone other than an officer, agent[,] or 'employee' " of Fairview to cases where there is no other valid and collectible insurance. The parties agree that Yeager was not an officer or employee, and we conclude that Yeager was not Fairview's agent. Thus, because Yeager was covered by West Bend's policy, Fairview's policy provided no coverage for the accident.

---

[3] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

*General Legal Principles*

■

¶ 17. We review the circuit court's grant of summary judgment de novo. *Paskiewicz v. American Family Mut. Ins. Co.*, 2013 WI App 92, ¶ 4, 349 Wis. 2d 515, 834 N.W.2d 866. Summary judgment is proper where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Pemper v. Hoel*, 2004 WI App 67, ¶ 4, 271 Wis. 2d 442, 677 N.W.2d 705.

■

¶ 18. Interpretation of an insurance policy is a question of law we review de novo. *Id.*, ¶ 5. Insurance policies are contracts, and they should be interpreted as such. *Smith v. Atlantic Mut. Ins. Co.*, 155 Wis. 2d 808, 810, 456 N.W.2d 597 (1990). Our main focus is the language of the policy, which we give "its plain and ordinary meaning as understood by a reasonable person in the position of the insured." *Wilson Mut. Ins. Co. v. Falk*, 2014 WI 136, ¶ 23, 360 Wis. 2d 67, 857 N.W.2d 156 (citation omitted). A construction that gives meaning to every provision of a contract is preferable to an interpretation that leaves part of the policy without meaning. *Stanhope v. Brown Cty.*, 90 Wis. 2d 823, 848–49, 280 N.W.2d 711 (1979). When a general provision and a specific provision conflict, the more specific provision prevails. *Ruppa v. American States Ins. Co.*, 91 Wis. 2d 628, 642, 284 N.W.2d 318 (1979).

■

¶ 19. An endorsement may add to, modify, or supplant the original policy. *Inter-Insurance Exch. of Chicago Motor Club v. Westchester Fire Ins. Co.*, 25 Wis. 2d 100, 105, 130 N.W.2d 185 (1964). It is generally read along with the policy. *Id.* However, if the endorse-

ment expressly states that its provisions should be substituted for those in the main body, the endorsement prevails. *Id.* Likewise, if the provisions of the endorsement are inconsistent with the main body, the endorsement controls. *Id.*

*Endorsement Section A.2 Controls*

¶ 20. The threshold question in this case is which provisions of the policy are operative in determining coverage. West Bend argues that coverage applies no matter which provision controls—the Garage Coverage Form, section A.2, section A.3, or various combinations thereof. Addison builds its case on section A.2. We agree with Addison.

¶ 21. In our view, a reasonable insured would read the Endorsement in Addison's policy as supplanting the Who Is An Insured provisions of the Garage Coverage Form. The Endorsement is entitled Wisconsin Changes—indicating a special applicability to this policy. On the top of the page, the Endorsement states that it "changes the policy." It further states that the Endorsement "modifies insurance provided under the . . . Garage Coverage Form," and similarly, that "the provisions of the Coverage Form apply unless modified by the endorsement."

¶ 22. Both sections A.2 and A.3 of the Endorsement by their terms purport to modify Who Is An Insured. Section A.2 says that for businesses like Fairview's, insureds now "include anyone other than an officer, agent or employee," but only if that person has no other valid and collectable insurance. This is a dramatic limitation of coverage that conflicts with the Garage Coverage Form, which, with some exceptions,

generally covers all permissive users. Section A.3, mirroring the Garage Coverage Form, indicates that "[a]nyone else" using a covered auto with appropriate permission is "added to Who Is An Insured." In light of the Endorsement's clear effort to restrict coverage in conflict with the Garage Coverage Form, the Endorsement is best read as supplanting the Who Is An Insured provisions of the Garage Coverage Form.

¶ 23. West Bend protests that section A.2 did not replace the Garage Coverage Form but merely added to it, pointing out that the policy says insured coverage is "changed to include." Our decision in *Pemper* conclusively and correctly rebuts this argument. The endorsement in *Pemper* stated—identically—that "WHO IS AN INSURED is changed to *include* anyone other than an officer, agent or employee . . . . However, that person is an 'insured' only if he or she has no other valid and collectible insurance with at least the applicable minimum limit." *Pemper*, 271 Wis. 2d 442, ¶ 7. We rejected the argument that the phrase "changed to include" suggested an additional category of insureds. *Id.*, ¶ 8. Rather, we held "that a reasonable insured would understand that the endorsement's definition of an insured is designed to supplant the main policy's definition." *Id.*, ¶ 9. Our interpretation of identical policy language in *Pemper* forecloses West Bend's proffered approach. Undoubtedly, policy issuers have relied on *Pemper* over the last twelve years to mean exactly what the court said the language meant. Like the policy in *Pemper*, the Endorsement here unambiguously supplanted the category of persons insured by the policy.[4]

---

[4] Among its alternative theories, West Bend argues that section 3.a.(2)(c) of the Garage Coverage Form provides an independent ground for coverage. Although we need not ad-

¶ 24. West Bend counters that *Pemper* is distinguishable because the Endorsement here presupposes the continued existence of the Garage Coverage Form. It points to section A.4 of the Addison policy, which "replace[s]" portions of the Garage Coverage Form's Who Is An Insured provision.[5] How can the entire Who Is An Insured section of the Garage Coverage Form be

dress it in any depth, West Bend does not make a plausible argument that the Garage Coverage Form would have supplied coverage. The form provides no coverage to a person working in a business that sells cars unless that business is Fairview's garage operations. Yeager was working for BSAA, not in Fairview's garage operations. And while garage operations includes work necessary and incidental to the business, we find no merit in the proposition that Yeager's work was necessary or incidental to Fairview's garage business. Therefore, the Garage Coverage Form would not have provided coverage even if it did apply.

[5] Section A.4 of the Wisconsin Changes Endorsement provides:

The Garage Coverage Form is changed as follows:

a. Paragraph a.(2)(d)(i) of the **Who Is An Insured** Provision is replaced by the following:

Has no other available insurance (whether primary, excess or contingent), they are an "insured" but only up to $115,000 for each "accident", which is the minimum combined single limit of liability specified by Wɪs. Sᴛᴀᴛ. [§] 344.01(2)(am).

b. Paragraph a.(2)(d)(ii) of the **Who Is An Insured** Provision is replaced by the following:

Has no other available insurance (whether primary, excess or contingent), less than the applicable minimum limit for "bodily injury" or "property damage" liability specified by Wɪs. Sᴛᴀᴛ. [§] 344.01(2)(am), they are an "insured" only for the amount by which the applicable minimum limit of liability exceeds the limit of their other insurance . . . .

supplanted by sections A.2 and A.3, West Bend implores, if the Endorsement itself provides for further itemized modifications of the Garage Coverage Form coverages?

¶ 25. This is a fair argument, but it does not win the day. Insurance contracts, including endorsements, regularly include language that is only operative in certain fact situations or for certain policy holders. A prime example is section A.1 of the Endorsement, which applies when the policy holder's business "is other than selling, servicing, repairing or parking 'autos.' " Neither party claims that A.1 applies to Fairview; Fairview is in the business of selling cars. Similarly, our review of section A.4 suggests that it too is inapplicable to Fairview.

¶ 26. Section A.4 purports to modify certain provisions of the Garage Coverage Form applying to "customers." The record reflects that Fairview buys cars to sell at auctions. It does not have a used car lot nor does it sell cars to the public, and therefore does not have "customers" as contemplated by the Garage Coverage Form. Section A.4 also indicates that it only applies when the declarations describe the policy holder as an auto "dealership" (presumably because dealerships have "customers" to whom the coverage applies). The declarations here describe Fairview's business as "used auto sales." Additionally, A.4 contains the same maximum coverage limits allowed by WIS. STAT. § 344.01(2)(am)[6] as section A.2, suggesting it applies in fact scenarios different than or otherwise

_____

[6] The policy describes the minimum "limit of liability specified by . . . [WIS. STAT. §] 344.01(2)(am)," the 2009–10 version of the statute. The minimum limits for motor vehicle handlers are now contained in § 344.01(2)(d). WIS. STAT. §§ 344.01(2)(d) & 632.32(5)(c) (2013–14).

not covered by section A.2. Again, the real question is not whether section A.4 presupposes the continued applicability of the Garage Coverage Form, but whether it applies to Fairview as the policy holder. While West Bend's argument is plausible in the abstract, it fails in practice because West Bend offers no coherent theory showing how section A.4 applies to Fairview. Therefore, consistent with *Pemper*, the best reading is that sections A.2 and A.3 of the Endorsement supplant the Garage Coverage Form.

¶ 27. What remains, then, is the proper reading of sections A.2 and A.3. Section A.2 applies to businesses "selling, servicing, repairing or parking 'autos' "—a definition both sides agree applies to Fairview. The provision goes on to modify who is covered by the policy "to include anyone other than an officer, agent or 'employee' . . . while using a covered 'auto' "—subject to the proviso that coverage applies only if the person "has no other valid and collectible insurance with at least the applicable minimum limit." This provision significantly limits coverage for a broad category of people—anyone other than an officer, agent, or employee. Section A.3, however, provides much more expansive coverage to "[a]nyone else . . . while using a covered 'auto' you own with your or any adult 'family member's' permission."

¶ 28. These provisions were not written from scratch by an enterprising Addison attorney; they derive from the framework outlined in Wisconsin's omnibus automobile insurance statute, WIS. STAT. § 632.32. Section 632.32 generally "applies to every policy of insurance issued or delivered in this state against the insured's liability for loss or damage" caused by motor vehicle accidents. Sec. 632.32(1). It requires that all insurance policies provide coverage to

those using a covered motor vehicle "when the use is for purposes and in the manner described in the policy," and that coverage must "extend[] to any person legally responsible for the use of the motor vehicle." Sec. 632.32(3)(a)-(b). Policies may, under the statute, "limit coverage to use that is with the permission of the named insured" or adult members of the insured's household. Sec. 632.32(5)(a). However, motor vehicle handlers like Fairview[7] do not have to provide such broad or uniform coverage. Rather, a motor vehicle handler "may restrict coverage afforded to anyone other than the motor vehicle handler or its officers, agents or employees to the limits under [WIS. STAT. §] 344.01(2)(d) and to instances when there is no other valid and collectible insurance." Sec. 632.32(5)(c). Sections A.2 and A.3 are obviously adopted and adapted from this framework.[8] Section A.2 copies the permissible limitation of coverage in para. (5)(c), and A.3 mirrors the permissive use limitation in para. (5)(a) .

¶ 29. The plain language and statutory context make clear that section A.2 is primary and operative here. First, section A.2 deliberately invokes a statute that allows insurers to restrict coverage—here beyond the default coverage of permissive use in the Garage Coverage Form. The only reasonable view is that Addison meant it as a limitation of coverage. *See Henry ex rel. Weis v. General Cas. Co.*, 225 Wis. 2d 849, 866, 593 N.W.2d 913 (Ct. App. 1999) (holding that insurers wishing to take advantage of the permissible restric-

---

[7] Fairview is in the business of selling cars which makes it a "motor vehicle handler" under the statute. WIS. STAT. §§ 218.0101(23)(a), 632.32(2)(b).

[8] Addison points out that the policy language is also derived from a standard form endorsement based on the statute and promulgated by Insurance Services Office.

tion of coverage in WIS. STAT. § 632.32(5)(c) must insert specific language in the policy so stating).

¶ 30. Moreover, Section A.2 is far more specific than section A.3. *See Ruppa*, 91 Wis. 2d at 642 (explaining that more specific provisions control over more general provisions). Section A.2 is more specific because it applies only to a certain class of policyholders—Fairview's business of selling vehicles; section A.3 applies to all policyholders. Section A.2 also applies to a very specific set of potential insureds—"anyone other than an officer, agent or employee"; section A.3 provides insurance more generally to "[a]nyone else."

¶ 31. Interpreting section A.2 as primary also makes the best sense of the text of section A.3, which reads and looks like a catchall for those not already covered. Section A.3 does not provide coverage merely to "anyone," but to "anyone *else.*" The word "else" necessarily implies something prior. For example, suppose a wife calls her husband and asks him to pick up milk and eggs at the store. He might respond, "Do we need anything else?" "Else" signifies that prior instructions have already been given. Similarly, the use of "anyone else" in section A.3 signifies that some delineation of coverage has already been given.

¶ 32. Further, interpreting section A.3 as a residual category best harmonizes sections A.2 and A.3. Section A.2 is a dramatic limitation of coverage for nonofficers, nonagents, and nonemployees; they only have coverage under Fairview's policy if they are without valid and collectible insurance. If we interpreted A.3 as applying to anyone, it would conflict with limitations of coverage in A.2 by providing coverage to nonofficers, nonagents, and nonemployees where A.2 would deny it. Our interpretation avoids finding a

conflict or an ambiguity, and it also makes sense of both provisions. *See Stanhope*, 90 Wis. 2d at 848–49.

¶ 33. For these reasons, a reasonable insured would understand that section A.2 is the primary provision, and section A.3 is a subordinate catchall. This reading, of course, does not on its face render A.3 without a zone of applicability. A.2, by its plain terms, does not apply to "an officer, agent or employee." Hence, section A.3 provides coverage to these individuals (subject, of course, to any other operative provisions in the policy).

## The Accident Is Not Covered By The Policy

¶ 34. Our reading of the policy's coverage can be summarized as follows: Section A.2 of the Endorsement limits coverage for anyone other than an officer, agent, or employee to those without other insurance. Section A.3 provides coverage for permissive use by Fairview's officers, agents, or employees. Yeager had other coverage under West Bend's policy and was using the auto with permission. The critical question, then, is whether Yeager was an officer, agent, or employee of Fairview. West Bend does not argue that Yeager was an officer or employee of Fairview; it contends that Yeager was acting as Fairview's agent at the time of the accident. If Yeager was acting as an agent of Fairview, then section A.2 does not apply to him and he would be covered under section A.3 of the Endorsement as a permissive user. If he was not an agent, the Addison policy provides no coverage because Yeager was already covered under West Bend's policy. We conclude that Yeager was not an agent of Fairview, and therefore was not covered under Fairview's policy with Addison.

¶ 35. West Bend argues that the term "agent" is ambiguous, and "must be interpreted in favor of coverage." West Bend cites *Kettner v. Wausau Ins. Cos.,* 191 Wis. 2d 723, 530 N.W.2d 399 (Ct. App. 1995), for the proposition that "agent" has more than one meaning and is therefore ambiguous. Based on *Kettner,* West Bend broadly claims that "Wisconsin law recognizes 'agent' as an ambiguous word." We disagree.

¶ 36. At the outset, if "agent," undefined, is ambiguous as a matter of law and always interpreted in favor of coverage, one might expect all insurers since *Kettner* was decided more than twenty years ago would have gotten the message and stopped using it in their policies. However, *Kettner* did not so hold. In *Kettner,* the core issue was whether a statute limiting the liability of certain governmental entities applied to independent contractors or just servants. *See id.* at 731. Thus, because the word "agent" may apply to either an independent contractor or a servant, we concluded that it was ambiguous as used in that statute. *Id.* at 732–33 ("[W]e conclude that the meaning of agent as used in [WIS. STAT.] § 893.80 is ambiguous."). We did not announce a broad rule that the word "agent" is categorically ambiguous in every statute or contract.

¶ 37. While it might be easy to say that words with broad common law meaning are ambiguous, courts must resist the temptation to use ambiguity as a short cut when faced with a vexing problem. Rather, our task, with the assistance of the parties, is to do the hard work of making sense of a contract even when it is not clear on the surface. Simply because a policy is complex does not mean it is ambiguous. *Hause v. Bresina,* 2002 WI App 188, ¶ 8, 256 Wis. 2d 664, 649

N.W.2d 736. A word or phrase in an insurance policy is not ambiguous unless it is "so imprecise and elastic as to lack any certain interpretation or [is] susceptible to more than one reasonable construction." *Frost ex rel. Anderson v. Whitbeck*, 2002 WI 129, ¶ 18, 257 Wis. 2d 80, 654 N.W.2d 225. Simply because different courts have come to different conclusions regarding a term "does not render [that] term ambiguous." *Wilson*, 360 Wis. 2d 67, ¶ 24. While the term "agent" may be ambiguous in certain statutes or contracts, it nevertheless contains enough definitional content to exclude certain persons who are clearly not agents. Agency—in the context of WIS. STAT. § 632.32 on which section A.2 is based—has a sufficiently clear common law meaning and application.[9]

¶ 38. The Wisconsin Supreme Court has accepted and applied this definition of agency from the Restatement: "[T]he fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Hoeft v. Friedel*, 70 Wis. 2d 1022, 1034, 235 N.W.2d 918 (1975); RESTATEMENT (SECOND) OF AGENCY § 1(1) (1958).[10] The party giving its consent to the other party to act on its behalf is the principal; the party who agrees to act for the principal is the agent.

---

[9] *Mutual Fed. S & L Ass'n v. Wisconsin Wire Works*, 58 Wis. 2d 99, 104–05, 205 N.W.2d 762 (1973) (technical words should be interpreted as they are usually understood by members of the profession to which they relate unless the context indicates a different intention by the parties).

[10] In addition to the parts of the Restatement that have been explicitly adopted by Wisconsin courts, we cite to other provisions for their persuasive value.

RESTATEMENT (SECOND) OF AGENCY § 1(2)-(3) (1958). Notably, an agent is one who acts "subject to [the principal's] control." RESTATEMENT (SECOND) OF AGENCY § 1(1) (1958). "It is well established that the most-important factor in determining whether a person is an agent is the extent of the control retained over the details of the work." Kablitz v. Hoeft, 25 Wis. 2d 518, 521, 131 N.W.2d 346 (1964).

¶ 39. Agents may be either servants or independent contractors. *Arsand v. City of Franklin*, 83 Wis. 2d 40, 48–49, 264 N.W.2d 579 (1978). A servant is a type of agent "whose physical conduct . . . is controlled or is subject to the right to control by the master." *Saunders v. DEC Int'l, Inc.*, 85 Wis. 2d 70, 77 n.1, 270 N.W.2d 176 (1978) (quoting RESTATEMENT (SECOND) OF AGENCY § 2(2) (1958)). The servant's principal, "who controls or has the right to control the physical conduct" of the servant, is called the "master." *Saunders*, 85 Wis. 2d at 77 n.1 (quoting RESTATEMENT (SECOND) OF AGENCY § 2(1) (1958)). A typical master/servant relationship is an employee acting on behalf of an employer. *See* RESTATEMENT (SECOND) OF AGENCY §220 cmt. g. (1958) (explaining that "servant" and "employee" are interchangeable terms).

¶ 40. An independent contractor is one "who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct." RESTATEMENT (SECOND) OF AGENCY § 2(3) (1958). While a servant is always an agent, an independent contractor may or may not be an agent. *Saunders*, 85 Wis. 2d at 77 n.1 (quoting RESTATEMENT (SECOND) OF AGENCY § 2(3) (1958)). This means that when an independent contractor has no fiduciary obligations to and

is not subject to control by the principal, no agency relationship has formed. *See* RESTATEMENT (SECOND) OF AGENCY § 14N, cmt. a (1958).[11] However, despite the lack of physical control over an independent contractor, an agency relationship may still exist when the fiduciary relationship has formed and the principal has control over certain activities. RESTATEMENT (SECOND) OF AGENCY § 14N (1958). Most of those we typically think of as agents—real estate agents, stockbrokers, and attorneys—are independent contractor agents. RESTATEMENT (SECOND) OF AGENCY § 14N, cmt. a (1958).

¶ 41. It is evident that Yeager and Fairview were not in a master/servant agency relationship. The agency relationship here, if it exists at all, is premised upon a claim that Yeager was an independent contractor acting as Fairview's agent for the purposes of selling the vehicle.

¶ 42. The circuit court was no doubt correct that "as a general rule the auctioneer is the agent of the seller." *Thorp Sales Corp. v. Gyuro Grading Co.*, 107 Wis. 2d 141, 148, 319 N.W.2d 879 (Ct. App. 1982). However, as the Restatement notes, although "the auctioneer, and other similar persons . . . are agents . . . as to their physical activities, they are independent contractors." RESTATEMENT (SECOND) OF AGENCY § 1, cmt. e (1958). This distinction is made because, unlike the master/servant relationship, independent contractor agents are not acting within the scope of their agency with respect to their physical

---

[11] RESTATEMENT (SECOND) OF AGENCY § 14N, cmt. a (1958) was cited with approval in *Pavalon v. Fishman*, 30 Wis. 2d 228, 235 n.8, 140 N.W.2d 263 (1966).

activities. Attorneys, for example, have a fiduciary obligation to their clients, are subject to the control of clients, and can bind clients through their actions. But as to their physical activities, they are independent contractors—that is, they are not acting subject to the control of a principal and do not create liability for the principal through their acts. Similarly, the agency relationship between the principal and the auctioneer generally does not extend to the physical activities of the auctioneer because the principal exercises no control over them. The auctioneer's authority as agent is limited. *Thorp* did not dispense with the requirement that control is necessary for agency; rather, it outlined a class of persons who are generally agents because the sellers (the principals) have the right to control the auctioneer in some respects and would be liable for actions the auctioneer takes on their behalf (namely, the obligation to complete the sale of a vehicle as agreed to by the buyer and auctioneer). Furthermore, simply because a principal engages an agent does not automatically convert all of the agent's employees into agents of the principal. Again, the critical question is control.

¶ 43. As already noted, the language of section A.2 is taken directly from Wis. Stat. § 632.32(5)(c), which allows insurers to restrict coverage for everyone other than the motor vehicle handler to whom the policy is issued and those acting on its behalf and for whom it is liable—"its officers, agents or employees." *Id.* Read as a whole, the legislature wanted to ensure that those driving cars on behalf of the motor vehicle handler—its officers, agents, and employees—were covered more broadly. It makes sense that the kind of agency contemplated here is that the driving of the car itself must be an act within the scope of agency.

¶ 44. We agree with the circuit court that BSAA had limited agency authority from Fairview to sell the Ford Explorer. But while BSAA may be an agent for certain purposes, that does not transform all of its services—including repairing vehicles, cleaning them, and storing them—into principal/agent activities. The question of agency is fact specific. As to driving the car to the proper location for the auction, Fairview had no control over Yeager—and consequently no agency relationship with him. Although Fairview exercised control over BSAA and the auctioneer in the sale of Fairview's vehicles, it did not exercise any control over BSAA's auction house set-up, safety precautions, training, or vehicle traffic patterns for moving vehicles in and out of place. Yeager did not have the fiduciary obligations of an agent, nor was he subject to Fairview's control, with respect to moving vehicles. Yeager was employed by BSAA to drive vehicles subject to BSAA's control. He followed a route designated by BSAA, not Fairview. Fairview had no control over any of Yeager's activities; Fairview had control only over the ultimate sale of its vehicles. Yeager, therefore, was not acting as Fairview's agent when the accident occurred.[12]

¶ 45. Because Yeager was not an officer, agent, or employee of Fairview, he was insured only if there was no other valid and collectible insurance pursuant to section A.2. But West Bend's policy with BSAA did

---

[12] We leave for another day the broader question of whether an agent under Wis. Stat. § 632.32(5)(c) must necessarily be in a master/servant agency relationship, thereby incorporating principles of vicarious liability under respondeat superior. The critical question is whether the driver was acting as an agent while driving. Here, Yeager was not.

cover the August 25, 2011 accident. Therefore, Yeager was not covered under Addison's policy.

¶ 46. Since the policy did not cover Yeager, the circuit court erred in ordering Addison to pay its policy limits and in awarding West Bend its attorneys' fees and costs in pursuing coverage. As to the appeal bond, because we reverse the circuit court's grant of summary judgment to West Bend, the issue is now moot.[13]

*By the Court.*—Judgment reversed.

---

[13] We generally decline to reach the merits of a moot issue as it is a purely academic exercise. *PRN Assocs. LLC v. DOA*, 2009 WI 53, ¶ 29, 317 Wis. 2d 656, 766 N.W.2d 559. "An issue is moot when the court concludes that its resolution cannot have any practical effect on the existing controversy." *Id.* (citation omitted). Addison does not identify a remedy regarding the appeal bond, so our decision will not have any practical effect on the controversy. Accordingly, we decline to address it.