John Y. Westmas, Individually and as Special
Administrator of the Estate of Jane L. Westmas
and Jason Westmas, Plaintiffs-Appellants,

v.

Selective Insurance Company of South Carolina,
Creekside Tree Service, Inc. and
ABC Insurance Company,
Defendants-Respondents.†

Court of Appeals

*No. 2015AP1039. Submitted on briefs February 10, 2016.
—Decided November 9, 2016.*

2016 WI App 92

(Also reported in 889 N.W.2d 178.)

† Petition for Review Filed.

685

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Christopher A. Duesing* and *Susan R. Tyndall* of *Habush Habush & Rottier, S.C.*, Waukesha.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Patrick W. Brennan* and *Benjamin A. Sparks* of *Crivello Carlson S.C.*, Milwaukee.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

¶ 1. GUNDRUM, J. Jane Westmas was killed when a tree branch cut by Creekside Tree Service, Inc. ("Creekside") fell on her while she and her son walked along a path through the property of Conference Point Center. John Westmas, Jane's husband, individually and as special administrator of the Estate of Jane Westmas, and Jason Westmas, John and Jane's son, (collectively "the Westmases") sued Creekside, and its insurer, Selective Insurance Company of South Carolina ("Selective").[1] Creekside moved for summary judg-

---

[1] Creekside and Selective brought a third-party action against Conference Point and its insurer, West Bend Mutual Insurance Company, alleging Conference Point was a joint tortfeasor. The Westmases subsequently filed a direct cause of action against Conference Point and West Bend. Conference Point and West Bend filed a motion for summary judgment asserting that the recreational immunity statute barred any claims against Conference Point. The Westmases did not

686

ment on recreational immunity grounds, which motion the circuit court granted. The Westmases appeal. We reverse.

*Background*

¶ 2. The relevant material facts are undisputed. Jane Westmas was struck and killed by a tree branch cut by Creekside as she and her son walked along a public shoreline path through the property of Conference Point, a faith-based conference and retreat center. Conference Point had contracted with Creekside to trim and remove trees from its property.

¶ 3. Creekside's sales/consultant foreman, certified arborist Jonathan Moore, formulated Creekside's proposal for the tree project. The proposal, which Creekside submitted to Conference Point months prior to the accident, stated Creekside would "provide labor, material, equipment and incidentals required for the completion" of the specific tree-trimming services detailed in the proposal. Prior to preparing the proposal, Moore met at Conference Point with Brian Gaasrud, vice chairperson of Conference Point's board of trustees. Moore testified at his deposition in this case that he "looked at the work that was described to me in broad scale, and I also identified work that I believed needed to be done, for example, a dead tree in a given location needs to be cut down. I put specific prices to specific items."

¶ 4. Conference Point initially hired the lowest bidder for the project, a company other than Creekside; however, when that company failed to complete it,

oppose the motion. By order dated March 24, 2015, the circuit court granted Conference Point and West Bend's motion for summary judgment and dismissed all claims against them.

Conference Point contracted with Creekside to do so. Moore then returned to Conference Point to determine what work the prior contractor had completed and "mark the trees that still needed to be removed" as he had designated in Creekside's earlier proposal.

¶ 5. Gaasrud testified at his deposition that when he met with prospective bidders, including Creekside, they walked through the Conference Point property and Gaasrud discussed "the vision and the concept of what we wanted to accomplish, the thinning, the repairing, the pruning." Gaasrud had no training, experience, or special knowledge regarding how a tree-trimming company should handle safety issues. He expected that the hired contractor would do its work in a safe manner "follow[ing] normal procedure, whatever procedure is for tree services when they're cutting, to create a safe perimeter." He left the "means and methods" for doing so up to the contractor.

¶ 6. Conference Point's property was not open to the public, with the exception of the shoreline path, and Gaasrud notified all of the contractors bidding on the project that even though the path appeared to be part of Conference Point's property, it was open to the public and there might be pedestrian traffic along it. Gaasrud also informed each bidder that Conference Point might have signs and barricades "in the shop" that the hired contractor could use to help control pedestrian traffic "[i]f [it] wanted to use them."

¶ 7. When Conference Point brought in Creekside to complete the tree-trimming project, Gaasrud and Creekside owner Joel Stauss modified Creekside's original proposal "to get the work scope to come within the amount of dollars" Conference Point had left for the project. Although Gaasrud knew Creekside would be working on the project at some point, he was not

specifically aware it would be doing so on the day of the accident. While Creekside was performing its work, Gaasrud had no conversations with it regarding "the experience they were having with people on the path," and he had no knowledge regarding what was or was not being done to block off the path or divert pedestrian traffic. No one from Conference Point was assigned to provide tools, equipment, or assistance to Creekside or was responsible for "checking up on" the work Creekside was doing at Conference Point.

¶ 8. Moore testified at his deposition that he was the person most responsible for training Creekside employees and most knowledgeable about safety. In general, once a customer hired Creekside for tree work, Moore would "take the crew to the job site, instruct them as to what needs to get done, generally show them exactly what to do, pre-mark trees for removal, pruning or show trees to be pruned or removed." Moore trained employees on safety, including that

> [i]f you are working in a close proximity or over a sidewalk, we need to put cones in the sidewalk. We need to put up some form of sign, or there needs to be a person in the sidewalk or path to stop either the person cutting the branch, the potential pedestrians, or both. Specifically the pedestrians, but you would also need to get the attention of the person in the tree or—or the person that's doing some form of work.

¶ 9. Based upon a conversation Stauss purportedly had with Gaasrud and relayed to Moore before Moore arrived at Conference Point for the first day of work, Moore believed Conference Point would be taking some noticeable steps to redirect pedestrians on the path or alert them to danger. Upon his arrival for the first day of work, however, Moore realized Confer-

ence Point had not taken any such steps, so Creekside set up cones along the path and utilized its employees as spotters who, verbally or with hand gestures, would either turn back pedestrians, temporarily halt them if tree work was in progress, or halt the tree work until pedestrians had passed. Moore testified that even if Conference Point had taken steps to redirect or alert pedestrians, Creekside "still would have used cones in the path and a spotter . . . used our own protocol" to protect pedestrians and Creekside employees. Moore believed using "spotters and notifying people of what was ahead was sufficient." It was Moore's understanding that while Creekside worked, it did not have authority to simply close down the path to all pedestrian traffic or detour pedestrians through other areas of the Conference Point property.

¶ 10. Moore and three other Creekside employees worked on the Conference Point project. Moore was responsible for the training of those employees and discussed with them specific safety issues related to the property, including "watching out for foot traffic." Moore participated in some of the work himself prior to the day of the accident, including moving cones or asking that cones be moved further down the path. Regarding the path, Moore testified:

> We had talked about pedestrians from the time the work began on the path. There had been already issues with pedestrians on the path where we had redirected them . . . .
>
> In a given instance, there was a gentleman that was—I think he was running a section of the path, and I asked him to go back. He was upset. I had told him, "I'm sorry, it's not safe for you to progress."
>
> . . . .

690

> The day that I was there working with them the
> majority of the day, . . . I'm sure there was more than
> one pedestrian that was on the path . . . .

¶ 11. On the first day of work, Moore got two of
the three employees started on trimming while he and
the crew leader walked to various locations on the
property to discuss specifics of the project, including
the branch that later killed Jane. Moore testified he
"show[ed] [the crew leader] the branch that was to be
removed . . . [and] explained to him the necessity to
have someone in the path watching for potential pe-
destrians because they were working in close proxim-
ity to the path." Moore added:

> We were to put cones in the path. We have cones, road
> cones that are orange on our chipper or in a truck, both
> typically. We utilize them around the vehicle. We also
> tend to utilize them in a sidewalk or, in this instance,
> the path. [The crew leader] was told to put cones in the
> path as they moved down the path.

Moore pointed out the specific locations for placing the
cones, and further told the crew leader to use a rope, if
needed, to bring down the branch, or "[i]f the path was
clear and he felt that was not needed, then just make
sure that someone is watching for pedestrians and . . .
cones are in the path." The three Creekside employees,
but not Moore, were working at Conference Point on
the day of the accident.

### Discussion

¶ 12. Our review of a circuit court's decision on
summary judgment is de novo. *Behrendt v. Gulf Un-
derwriters Ins. Co.*, 2009 WI 71, ¶ 11, 318 Wis. 2d 622,

768 N.W.2d 568. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

¶ 13. WISCONSIN STAT. § 895.52(2)(b) (2013–14),[2] provides in relevant part that "no *owner* and no officer, employee or *agent* of an owner is liable for the death of, any injury to, or any death or injury caused by, a person engaging in a recreational activity on the owner's property." (Emphasis added.) "Owner" is defined to include "[a] person . . . that owns, leases or *occupies* property." Sec. 895.52(1)(d)1. (emphasis added).

██

¶ 14. The Westmases contend the circuit court erred in concluding Creekside was entitled to recreational immunity under WIS. STAT. § 895.52 on the independent grounds that at the time of the accident Creekside (1) was an "agent" of Conference Point and (2) was an "occupie[r]" of the Conference Point property, and thus statutorily was itself an "owner" of the property. Determining whether Creekside was an "agent" or an "occupier" requires us to interpret and apply § 895.52. The interpretation and application of a statute is a matter of law we review de novo. *State v. Simmelink*, 2014 WI App 102, ¶ 5, 357 Wis. 2d 430, 855 N.W.2d 437; *Showers Appraisals, LLC v. Musson Bros.*, 2013 WI 79, ¶ 21, 350 Wis. 2d 509, 835 N.W.2d 226. We reverse because we conclude Creekside was neither an agent of Conference Point nor an occupier of its property and, therefore, Creekside is not entitled to recreational immunity.

---

[2] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

*Creekside was not an "agent" of Conference Point*

¶ 15. Creekside maintains that at the time of the accident, it was an "agent" of Conference Point under Wis. Stat. § 895.52 and, therefore, entitled to recreational immunity. Section 895.52 does not define the term "agent" and the parties have not identified, nor have we been able to find, any Wisconsin cases defining the term within the context of § 895.52.

¶ 16. Wisconsin case law does hold, however, that an agent may be either a servant or an independent contractor. *See Romero v. West Bend Mut. Ins. Co.*, 2016 WI App 59, ¶ 36, 371 Wis. 2d 478, 885 N.W.2d 591. And, "[w]hile a servant is always an agent, an independent contractor may or may not be an agent." *Id.*, ¶ 40. "The question of agency is fact specific," *id.*, ¶ 44, with the most important consideration being "the extent of the control retained over the details of the work," *id.*, ¶ 38 (quoting *Kablitz v. Hoeft*, 25 Wis. 2d 518, 521, 131 N.W.2d 346 (1964)). In a fairly recent governmental immunity case, our supreme court held that a contractor is an agent of a government entity and therefore entitled to immunity under Wis. Stat. § 893.80 when it is shown that the government entity had "the right to control the tasks performed by the contractor with 'reasonably precise specifications'" and the contractor "followed those specifications." *Showers*, 350 Wis. 2d 509, ¶ 37. Under the *Showers* court's view of agency, a contractor is not an agent, however, if it retains significant control over "the alleged injury-causing action." *See id.*, ¶ 51.

¶ 17. In this case, the parties agree Creekside was an independent contractor for Conference Point.

In deciding whether Creekside was an agent of Conference Point at the time of the accident then, we must consider the extent of control Conference Point retained over the details of Creekside's work. As the Westmases point out, however, "there is no evidence that Conference Point either controlled the details of Creekside's work or formulated any 'reasonably precise specifications' for that work."

¶ 18. Gaasrud testified that when he met with prospective bidders, including Creekside, he discussed "the *vision* and the *concept* of what [Conference Point] wanted to accomplish," but left up to the contractor the means and methods for how it would accomplish the job in a safe manner. (Emphasis added.) Gaasrud added that he "would have expected" a contractor doing the tree-trimming work to "follow normal procedure, whatever [the] procedure is for tree services when they're cutting, to create a safe perimeter." Gaasrud's deference to the hired contractor made sense of course, since he had no training, experience, or special knowledge regarding how a company trimming trees should handle safety issues related to its work. While Creekside was performing its work at the Conference Point property, Gaasrud had no conversations with Creekside regarding anything Creekside was doing with regard to pedestrian traffic on the path, and indeed Gaasrud was not even aware Creekside would be working on the day of the accident. No one from Conference Point was assigned to "check[] up on" Creekside's work or provide Creekside with equipment or assistance.

¶ 19. Certified arborist Moore, Creekside's sales consultant/foreman, testified that in preparing Creekside's bid for the job several months prior to the accident, he met with Gaasrud at the Conference Point

694

property and "looked at work that was described to [him] in *broad scale*," and he also identified specific trees he believed needed attention. (Emphasis added.) When Moore later returned to the Conference Point property so Creekside could complete the job the other contractor had started, Moore "mark[ed] the trees that still needed to be removed."

¶ 20. Moore was responsible for training Creekside employees doing tree work, including training them with regard to safety issues such as "watching out for foot traffic." Working at Conference Point with the three other Creekside employees on the first day of the project, Moore met with the crew leader, discussed particulars of the project, and addressed safety issues related to the property, including pedestrians along the path and the specific branch that later killed Jane. Moore pointed out specific locations for placing safety cones and instructed the crew leader to use a rope, if needed, to bring down the branch, or "[i]f the path was clear and [the crew leader] felt that was not needed, then just make sure that someone is watching for pedestrians and . . . cones are in the path." For safety along the path, Creekside chose to utilize cones and its employees as spotters who would either turn back pedestrians, temporarily halt them if tree work was in progress, or halt the tree work until pedestrians had passed.

¶ 21. The material undisputed facts unquestionably demonstrate that Conference Point merely provided Creekside with the general "vision," "concept," and "broad scale" of the tree work to be done on the property and coordinated with Creekside to ensure its work would come within Conference Point's remaining budget. Creekside has not shown that Conference Point provided "reasonably precise specifications"

which controlled Creekside's "alleged injury-causing action." *See Showers*, 350 Wis. 2d 509, ¶ 51. From the decision regarding whether or not to use a rope to bring down the branch that killed Jane, to where safety cones would be placed, to how "spotters" would be utilized, the record is clear that Creekside, not Conference Point, maintained control over the details of its work, particularly the actions that led to Jane's death. Creekside was not Conference Point's agent for purposes of WIS. STAT. § 895.52.

*Creekside did not "occupy" Conference Point's property*

¶ 22. Creekside also claims it was an occupier of Conference Point's property at the time it cut the branch that killed Jane and, as an occupier, it is entitled to recreational immunity as a statutorily defined "owner." *See* WIS. STAT. § 895.52(1)(d)1. (defining "owner" as including "[a] person . . . that owns, leases or occupies property"). As with the term "agent," § 895.52 fails to define "occupies." Our supreme court's very recent decision in *Roberts v. T.H.E. Ins. Co.*, 2016 WI 20, ¶ 27, 367 Wis. 2d 386, 879 N.W.2d 492, however, provides guidance for applying the term "occupies" within the recreational immunity context.[3]

---

[3] In a letter to us following briefing, the Westmases assert that *Roberts v. T.H.E. Inc. Co.*, 2016 WI 20, 367 Wis. 2d 386, 879 N.W.2d 492, provides significant support for their contention that Creekside did not qualify as an "occupier" of Conference Point's property at the time of the accident. Because *Roberts* is not helpful to Creekside, we were not surprised by Creekside's response letter arguing the decision in *Roberts* has "no bearing on the present case." We note, however, that before the circuit court in this case, Creekside relied on our subse-

¶ 23. In *Roberts*, the owner/operator of a hot air balloon donated rides at a charity event. *Id.*, ¶ 6. The plaintiff in the case was injured when one of the lines tethering the balloon broke free and the balloon basket struck her while she waited in line for a ride. *Id.*, ¶ 10. She sued the owner/operator of the balloon, who was neither the sponsor of the event nor the owner of the property on which the event was held. *Id.*, ¶ 5.

¶ 24. On appeal, our supreme court approved of the dictionary definition of "occupy," for WIS. STAT. § 895.52 purposes, as "to take and hold possession." *Id.*, ¶ 34 (citing *Doane v. Helenville Mut. Ins. Co.*, 216 Wis. 2d 345, 575 N.W.2d 734 (Ct. App. 1998) (citing WEBSTER'S NEW COLLEGIATE DICTIONARY 794 (8th ed. 1974))). And while we previously have expressed that the term "occupies" in § 895.52 "should be interpreted to encompass a resident of land who is more transient than either a lessee or an owner," *see Held v. Ackerville Snowmobile Club, Inc.*, 2007 WI App 43, ¶ 16, 300 Wis. 2d 498, 730 N.W.2d 428, and *Leu v. Price Cty. Snowmobile Trails Ass'n, Inc.*, 2005 WI App 81, ¶ 11, 280 Wis. 2d 765, 695 N.W.2d 889, the *Roberts* court observed that " 'occupy,' as it is used in WIS. STAT. § 895.52, has been defined as 'requiring a degree of permanence, as opposed to mere use,' " *Roberts*, 367 Wis. 2d 386, ¶ 34 (citation omitted). *See also WEA Prop. & Cas. Ins. Co. v. Krisik*, 2013 WI App 139, ¶ 21, 352 Wis. 2d 73, 841 N.W.2d 290 ("Although an occupant is not required to have exclusive control of the property, an occupant's use of the property should have 'a degree of permanence.' "), and *Doane*, 216 Wis. 2d at 351 (" 'occupancy,' in the statutory sense, signifies a

quently reversed decision in *Roberts* and stated that our *Roberts* decision "could be dispositive" of the "occupier" issue in this case, and "the [circuit] court should consider it."

697

degree of permanence, as opposed to the mere use of the property in question." (citation omitted)).

¶ 25. The *Roberts* court also noted that the purpose of the recreational immunity statute is to "encourage landowners to open the land for public use," and declined to "define" the balloon owner/operator as an occupier as doing so "would not further the policy underlying the statute because the . . . property was already open for public recreational purposes." *Roberts*, 367 Wis. 2d 386, ¶¶ 35–36. "Immunizing [the balloon owner/operator]," the court continued, "would have no effect on whether the public had access to private land," because the property owner and event sponsor, not the balloon owner/operator, were responsible for opening the land to the public. *Id.*, ¶ 37. The court further stated: "Granting immunity to third parties that are not responsible for opening up the land to the public is unsupported by our prior case law. In addition, it would create an absurd result with no logical stopping point that does nothing to further the legislative purpose of the statute." *Id.*, ¶ 41. Thus, the court concluded that the owner/operator of the balloon was not an "occupier" of the land and, therefore, not entitled to recreational immunity under WIS. STAT. § 895.52. *Roberts*, 367 Wis. 2d 386, ¶ 41.

¶ 26. In light of the context in which the term "occupies" is used in WIS. STAT. § 895.52, it is not surprising that our courts would expect an occupier-owner to have some "degree of permanence" with regard to the property, as opposed to a temporary presence, and "responsib[ility] for opening up the land to the public." The other statutorily defined owners—an owner or lessee of property—generally have some degree of permanence (albeit likely greater than an occupier-owner, *see Held*, 300 Wis. 2d 498,

698

¶ 16, and *Leu*, 280 Wis. 2d 765, ¶ 11) as to the property as well as responsibility for opening it up. In addition, it is no trite matter that the legislature defined an occupier of property as an *owner* of it, such that one would expect a person satisfying the "occupies" definition to have characteristics short of but similar to those of an owner. Likewise, a person who takes and "hold[s] possession" of property—the *Roberts* court's definition of an occupier—would be expected to have more than a mere temporary presence on the property as well as some level of control over who may enter upon it and for what purpose.

¶ 27. In the case now before us, Creekside's presence on Conference Point's property did not exceed "mere use" and approach "a degree of permanence." *See Roberts*, 367 Wis. 2d 386, ¶ 34. In the few days it was on the property, Creekside moved from temporary location to temporary location for the limited purpose of trimming trees as needed to satisfy its contract with Conference Point.[4] Furthermore, Creekside was "not responsible for opening up the land to the public," and indeed did not have authority to do so. In fact, Creekside was not even permitted to temporarily detour pedestrians by directing them through other areas of Conference Point's property.

¶ 28. Based upon the material undisputed facts, Creekside cannot be said to have "take[n] and h[e]ld

[4] And, unlike the cases cited on appeal by Creekside involving the regular and repeated grooming of snowmobile trails by a snowmobile club or association, *see Held v. Ackerville Snowmobile Club, Inc .*, 2007 WI App 43, ¶¶ 3, 18, 20, 300 Wis. 2d 498, 730 N.W.2d 428, and *Leu v. Price Cty. Snowmobile Trails Ass'n, Inc.*, 2005 WI App 81, ¶¶ 3, 4, 13, 15, 280 Wis. 2d 765, 695 N.W.2d 889, there was no regular or repeated tree maintenance by Creekside on Conference Point's property. This was a one-time tree-trimming project of limited duration.

possession" of the Conference Point property. As a result, it was not an occupier and thus not a statutory owner of the property for purposes of WIS. STAT. § 895.52.

*By the Court.*—Judgment reversed and cause remanded.