# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP1039 |
| COMPLETE TITLE: | John Y. Westmas Individually and as Special Administrator of the Estate of Jane L. Westmas and Jason Westmas, <br><br>          Plaintiffs-Appellants, <br>    v. <br>Creekside Tree Service, Inc., <br><br>          Defendant-Respondent-Petitioner, <br>Selective Insurance Company of South Carolina and ABC Insurance Company, <br><br>          Defendants-Respondents. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 372 Wis. 2d 683, 889 N.W.2d 178
PDC No:  2016 WI App 92 - Published

| | |
|---|---|
| OPINION FILED: | February 7, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 3, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Walworth |
| JUDGE: | Phillip A. Koss |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | R.G. BRADLEY, J. and KELLY, J. (coauthor) dissent (opinion filed). |
| NOT PARTICIPATING: | ABRAHAMSON, J. did not participate. |

ATTORNEYS:

For the defendant-respondent-petitioner, there were briefs filed by *Benjamin A. Sparks*, *Patrick W. Brennan*, *Sarah Fry Bruch*, and *Crivello Carlson S.C.*, Milwaukee.  There was an oral argument by *Patrick W. Brennan*.

For the plaintiffs-appellants there was a brief filed by *Christopher A. Duesing*, *Susan R. Tyndall*, and *Habush Habush & Rottier*, *S.C.*, Waukesha.  There was an oral argument by *Susan Tyndall* and *Cristopher Duesing.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2015AP1039
(L.C. No.   2013CV813)

STATE OF WISCONSIN                    :        IN SUPREME COURT

**John Y. Westmas Individually and as Special Administrator of the Estate of Jane L. Westmas and Jason Westmas,**

          **Plaintiffs-Appellants,**

     **v.**

**Creekside Tree Service, Inc.,**

          **Defendant-Respondent-Petitioner,**

**Selective Insurance Company of South Carolina and ABC Insurance Company,**

          **Defendants-Respondents.**

**FILED**

**FEB 7, 2018**

Diane M. Fremgen
Acting Clerk of Supreme
Court

REVIEW of a published decision of the court of appeals. *Affirmed.*

¶1   PATIENCE DRAKE ROGGENSACK, C.J.   Jane Westmas was killed when a tree branch cut by Creekside Tree Service, Inc. ("Creekside") fell on her while she and her adult son were walking on a public path through the property of Conference Point Center.   Conference Point had contracted with Creekside to trim and remove trees from its property.   Jane's husband, John

Westmas, and her son, Jason Westmas, sued Creekside and its insurer, Selective Insurance Company of South Carolina.[1] Creekside moved for summary judgment on the ground that the recreational immunity statute, Wis. Stat. § 895.52 (2013-14),[2] barred claims against it. The circuit court[3] granted Creekside summary judgment, and the court of appeals reversed. Westmas v. Selective Ins. Co. of S.C., 2016 WI App 92, 372 Wis. 2d 683, 889 N.W.2d 178.

¶2 We review two issues. First, we consider whether Creekside, as the entity hired by Conference Point to complete a tree-trimming project, is protected from liability as an "agent" of Conference Point under Wis. Stat. § 895.52(2)(b). Section 895.52(2)(b) provides that "no owner and no officer, employee or agent of an owner is liable for the death of, any injury to, or any death or injury caused by, a person engaging in a

---

[1] Creekside and Selective Insurance brought a third-party action against Conference Point Center and its insurer, West Bend Mutual Insurance Company, alleging that Conference Point was a joint tortfeasor. The Westmases subsequently filed a direct action against both Conference Point and West Bend. Conference Point and West Bend moved for summary judgment, asserting that the recreational immunity statute, Wis. Stat. § 895.52, barred claims against Conference Point. The Westmases did not oppose the motion. The circuit court granted Conference Point and West Bend's motion for summary judgment, dismissing all claims against them. Conference Point is not a party to this review.

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[3] The Honorable Phillip A. Koss of Walworth County presided.

recreational activity on the owner's property." The second issue is whether Creekside is entitled to recreational immunity as an occupier of the Conference Point property, such that it was a statutory "owner" of the property at the time of the accident. "Owner" is defined to include "[a] person . . . that owns, leases or occupies property." § 895.52(1)(d)1.

¶3 As to the first issue, we conclude that Creekside was not an agent of Conference Point because Conference Point had neither control of, nor the right to control, the details of Creekside's work, including the acts that caused injury to Jane Westmas. We further conclude that Creekside was not an occupier of Conference Point's property because its presence on the property exhibited no "degree of permanence, as opposed to mere use."

¶4 Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶5 Conference Point Center is a faith-based youth camp and conference center located on the shores of Lake Geneva in southeastern Wisconsin. With the exception of a shoreline path, Conference Point's property is not open to the public. In early 2012, Conference Point requested bids to perform tree-trimming work on its property, which included pruning and removing trees

located along the shoreline path. Creekside was one of the contractors who bid on the project.[4]

¶6 Before preparing its bid, Jonathan Moore, Creekside's sales/consultant and foreman, met with Brian Gaasrud, the vice chairperson of Conference Point's board, to conduct a walk-through of the property and to discuss Conference Point's project. Gaasrud did not provide plan specifications from which to bid, but instead provided a verbal description of the project and showed Moore the areas requiring work, including the public shoreline path. Gaasrud testified at his deposition that he described to each prospective bidder "the vision and the concept of what we wanted to accomplish, the thinning, the repairing, the pruning." Gaasrud informed each bidder that Conference Point had safety signs available if the contractor wanted to use them. Gaasrud had no training, experience, or special knowledge regarding how a tree-trimming company should handle safety issues. He testified at his deposition that he expected the contractor would conduct itself in a safe manner "follow[ing] normal procedure, whatever [the] procedure is for tree services when they're cutting, to create a safe perimeter." Gaasrud left the "means and methods" by which trees would be pruned or removed to each contractor.

---

[4] Creekside had contracted with Conference Point in the past. That separate contract is not relevant to the issues now before us.

¶7 In its February 7, 2012 bid, Creekside stated that it would "provide labor, material, equipment and incidentals required for the completion of the above" tree-trimming. The bid described, in general terms, tree-trimming that Creekside would complete in several locations of Conference Point's property. For the east shoreline location where Jane Westmas was injured, the bid provided:

> *Removal of 10 dead or hazardous trees, on hill or overhanging shoreline path, to grade level.
> *Pruning to reduce weight for trees overhanging water's edge or to improve structure/reduce competition.
> *Remove large deadwood overhanging path from canopy trees (4" diameter and larger).
> *Prune canopy trees to thin and/or reduce weight for additional sunlight, focusing on shoreline trees between Sunrise and Chapin Houses.

The bid provided no details about how these tasks were to be accomplished.

¶8 Conference Point did not initially hire Creekside, but when the company Conference Point had hired unexpectedly quit, Creekside was brought in to complete the tree-trimming, including the portions along the public shoreline path. At that time, Gaasrud and Creekside owner Joel Strauss modified Creekside's bid by reducing the scope of the tree-trimming so it would come within Conference Point's remaining budget. Creekside's February 7, 2012 bid is the only writing that describes the tree-trimming services Creekside agreed to provide.

5

¶9 Although Gaasrud knew Creekside would be working on the project, he was not aware of specific dates of work, nor did he have any knowledge of what was being done to block off the shoreline path or divert pedestrian traffic. No one at Conference Point was assigned to check in with Creekside or to provide assistance to Creekside in any way.

¶10 Moore testified at his deposition that he was the person responsible for training Creekside employees. In general, once Creekside was hired for a tree-trimming project, Moore would take his crew to the job site, instruct them as to what needed to be done, pre-mark trees for removal, and identify trees that needed to be pruned. Moore explained how he trained Creekside employees on safety:

> If you are working in a close proximity or over a sidewalk, we need to put cones in the sidewalk. We need to put up some form of sign, or there needs to be a person in the sidewalk or path to stop either the person cutting the branch, the potential pedestrian, or both. Specifically the pedestrians, but you would also need to get the attention of the person in the tree or -- or the person that's doing some form of work.

¶11 On about May 8 or 9, 2012, Moore and three other Creekside employees began work on the Conference Point project. Moore and the crew leader walked to various portions of the property to discuss specifics and safety concerns, including the need to watch out for foot traffic on the shoreline path. Moore testified at his deposition that Creekside was told no detours or barricades on the path were permitted. Regarding the path, Moore testified:

6

We had talked about pedestrians from the time the work began on the path. There had been already issues with pedestrians on the path where we had redirected them . . . .

In a given instance, there was a gentleman that was -- I think he was running a section of the path, and I asked him to go back. He was upset. I had told him, "I'm sorry, it's not safe for you to progress."

. . . .

The day that I was there working with them the majority of the day, . . . I'm sure there was more than one pedestrian that was on the path . . . .

¶12 Moore instructed Creekside employees to set up two orange traffic cones, one on each side of the path. In addition, Creekside utilized its employees as spotters, who were assigned to warn and divert approaching pedestrians, and to halt the tree work if necessary. Moore testified that even if Conference Point had taken steps to redirect or alert pedestrians, Creekside "still would have used cones in the path and a spotter . . . used our own protocol" to protect the public and Creekside employees. Moore did not believe Creekside had the authority to shut down the path or detour pedestrians through Conference Point's private property.

¶13 On May 10, 2012, Jane Westmas and her son, Jason Westmas, were walking on the public path that runs along Conference Point's east shoreline. A tree branch cut by Creekside fell and hit Jane, causing severe injuries that resulted in her death. Moore had marked the specific branch that hit Jane for removal and noted it for its dangerous position. The location of this branch was particularly

hazardous due to the overhang of a nearby building, which obscured the views of both the pedestrian and the tree-cutter. Moore testified he "show[ed] [the crew leader] the branch that was to be removed . . . [and] explained to him the necessity to have someone in the path watching for potential pedestrians . . . ."

¶14 Creekside used no barriers or caution tape to warn pedestrians. At the time of the accident, Moore was not present at the site, although he had noted in the days prior that pedestrians had walked up to or into the work zone. Moore agreed that two spotters would have been better.

¶15 John Westmas, individually and as special administrator for the Estate of Jane L. Westmas, and Jason Westmas, sued Creekside, alleging that Creekside's negligence was a cause of Jane's death. The Westmases further alleged that, as a result of watching his mother die, Jason suffered severe and permanent emotional distress. Before the circuit court, Creekside prevailed on summary judgment on the ground that the recreational immunity statute, Wis. Stat. § 895.52, barred claims against it. The court of appeals reversed.[5] We granted review and now affirm the court of appeals.

## II. DISCUSSION

### A. Standard of Review

---

[5] _Westmas v. Selective Ins. Co. of S.C._, 2016 WI App 92, 372 Wis. 2d 683, 889 N.W.2d 178.

¶16 This case requires us to review summary judgment that denied dismissal of John and Jason Westmas's claims against Creekside. We review a grant or denial of summary judgment independently, applying the same standard employed by the circuit court and court of appeals, while benefitting from their discussions. Dufour v. Progressive Classic Ins. Co., 2016 WI 59, ¶12, 370 Wis. 2d 313, 881 N.W.2d 678 (citing Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶16, 360 Wis. 2d 129, 857 N.W.2d 136). Summary judgment is appropriate only when there is no genuine dispute of material fact and the moving party has established his or her right to judgment as a matter of law. Wis. Stat. § 802.08(2); Wadzinski v. Auto-Owners Ins. Co., 2012 WI 75, ¶10, 342 Wis. 2d 311, 818 N.W.2d 819.

¶17 Here, the material facts are not disputed. Accordingly, we focus on whether the application of Wis. Stat. § 895.52 to undisputed facts bars the Westmases's claims. Statutory interpretation and application are questions of law that we review independently, while benefitting from the analyses of the circuit court and the court of appeals. Highland Manor Assoc. v. Bast, 2003 WI 152, ¶8, 268 Wis. 2d 1, 672 N.W.2d 709.

B. Statutory Interpretation

1. General principles

¶18 The purpose of statutory interpretation is to determine what the statute means so that it may be properly applied. State ex rel. Kalal v. Circuit Court for Dane Cty.,

9

2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Statutory interpretation begins with the language of the statute. Id., ¶45. "If the words chosen for the statute exhibit a 'plain, clear statutory meaning,' without ambiguity, the statute is applied according to the plain meaning of the statutory terms." State v. Grunke, 2008 WI 82, ¶22, 311 Wis. 2d 439, 752 N.W.2d 769 (quoting Kalal, 271 Wis. 2d 633, ¶46). However, where the statute is "capable of being understood by reasonably well-informed persons in two or more senses[,]" the statute is ambiguous. Kalal, 271 Wis. 2d 633, ¶47.

¶19 A statutory provision must be read "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id., ¶46. An interpretation should give effect to every word. Id. Statutory purpose is important in discerning the plain meaning of a statute. Id., ¶48. Therefore, in construing a statute, we favor a construction that fulfills the purpose of the statute over one that defeats statutory purpose. Cty. of Dane v. LIRC, 2009 WI 9, ¶34, 315 Wis. 2d 293, 759 N.W.2d 571.

¶20 If we determine that the language of Wis. Stat. § 895.52 is ambiguous, we may then consult extrinsic sources, such as legislative history. Kalal, 271 Wis. 2d 633, ¶50. However, even where the statutory language bears a plain meaning, "we nevertheless may consult extrinsic sources 'to

10

confirm or verify a plain-meaning interpretation.'" Grunke, 311 Wis. 2d 439, ¶22 (quoting Kalal, 271 Wis. 2d 633, ¶51).

2. Wisconsin Stat. § 895.52

¶21 In 1983, the Wisconsin legislature enacted Wis. Stat. § 895.52, which dramatically expanded liability protection for landowners who open their private property for public recreational use. Section 895.52(2) provides:

> (2) No Duty; Immunity from Liability. (a) Except as provided in subs. (3) to (6), no owner and no officer, employee or agent of an owner owes to any person who enters the owner's property to engage in a recreational activity:
>
> 1. A duty to keep the property safe for recreational activities.
>
> 2. A duty to inspect the property, except as provided under s. 23.115(2).
>
> 3. A duty to give warning of an unsafe condition, use or activity on the property.
>
> (b) Except as provided in subs. (3) to (6), no owner and no officer, employee, or agent of an owner is liable for the death of, any injury to, or any death or injury caused by, a person engaging in a recreational activity on the owner's property.[6]

---

[6] Wisconsin Stat. § 895.52 replaced a previous recreational immunity statute, Wis. Stat. § 29.68 (1963), which had been interpreted to grant immunity only to landowners whose land was used for activities typically reliant on land "in its natural undeveloped state." See Laesch v. L&H Indus. Ltd., 161 Wis. 2d 887, 900, 469 N.W.2d 655 (Ct. App. 1991) (concluding that § 29.68 did not grant immunity to a contractor working to deconstruct an abandoned railroad right-of-way because neither the activity, which was riding an ATV, nor the modified condition of the land, fell within the purview of the statute).

11

¶22 The legislative purpose of the statute is stated in 1983 Wis. Act. 418, § 1. The session law provides:

> The legislature intends by this act to limit the liability of property owners toward others who use their property for recreational activities under circumstances in which the owner does not derive more than a minimal pecuniary benefit.

"As our cases have explained, 'the impetus for this law is the continual shrinkage of the public's access to recreational land in the ever more populated modern world.'" Roberts v. T.H.E. Ins. Co., 2016 WI 20, ¶28, 367 Wis. 2d 386, 879 N.W.2d 492 (citing Hall v. Turtle Lake Lions Club, 146 Wis. 2d 486, 489, 431 N.W.2d 696 (Ct. App. 1988)). The legislature explained that the statute is to be "liberally construed in favor of property owners to protect them from liability." See Ervin v. City of Kenosha, 159 Wis. 2d 464, 476, 464 N.W.2d 654 (1991). Accordingly, courts have interpreted the protections of Wis. Stat. § 895.52 expansively.

¶23 Generally, "owners" under Wis. Stat. § 895.52 do not owe a duty of care to keep their properties safe for entry or recreational use.[7] See Verdoljak v. Mosinee Paper Corp., 200 Wis. 2d 624, 635, 547 N.W.2d 602 (1996). Section 895.52(1)(d)1.

---

[7] There are, of course, potential modifications to this premise, including where a landowner maliciously fails to warn against an unsafe condition on the property, of which the landowner was aware. See Wis. Stat. § 895.52(6) (regarding private property owners); § 895.52(3)(b) (regarding state immunity); § 895.52(4)(b) (regarding other governmental bodies); § 895.52(5) (regarding nonprofit immunity).

12

defines "owner" as "[a] person, including a governmental body or nonprofit organization, that owns, leases or occupies property."

¶24 It is undisputed that while Jane and Jason Westmas were walking along the public path, they were engaging in a recreational activity within the meaning of Wis. Stat. § 895.52(1)(g).[8] It is also undisputed that Conference Point, a non-profit organization within the meaning of 26 U.S.C. § 501(c)(3), properly was granted summary judgment as an "owner" under § 895.52(1)(d)1.

¶25 Because Creekside claims to be an agent of Conference Point, or in the alternative, an occupier that qualifies as a statutory owner for immunity under Wis. Stat. § 895.52(1)(d)1., we determine whether Creekside fits the statutory meaning of agent or, in the alternative, whether Creekside was a statutory occupier of recreational land such that it, too, is protected by the provisions of § 895.52.

a. Agency

¶26 Wisconsin Stat. § 895.52 does not define agent or occupier. We begin with determining the statutory meaning of agent as employed in § 895.52(2). To do so, we employ the principles of statutory interpretation delineated above, wherein we examine the language, context, and scope of § 895.52. State

---

[8] Wisconsin Stat. § 895.52(1)(g) provides that recreational activity means "outdoor activity undertaken for the purpose of exercise, relaxation or pleasure, including practice or instruction in any such activity." Subsection (1)(g) also lists 32 examples of activities that come within the statute.

13

v. Soto, 2012 WI 93, ¶20, 343 Wis. 2d 43, 817 N.W.2d 848 (concluding that "the statutory context in which a term is used, including the language and structure of surrounding or closely related statutes, is often highly instructive in determining a term's meaning."). As we do so, we determine whether "agent" has a plain and ordinary meaning, or whether it is ambiguous. Kalal, 271 Wis. 2d 633, ¶¶46-47.

¶27 As we read Wis. Stat. § 895.52(2)(a) and (b), we note that agent is included in a list of those who may have immunity from liability, such as "officer, employee or agent of an owner." Section 895.52(3), relating to liability for injuries sustained on state property, again uses agent in a listing of persons: "officer, employee or agent of this state," as does § 895.52(4) relating to liability of other governmental units. Section 895.52(5), which is one of our foci because it relates to nonprofit organizations, employs the same list: "officers, employees or agents."

¶28 An officer of a corporate entity "is under a fiduciary duty of loyalty, good faith and fair dealing in the conduct of corporate business." Modern Materials, Inc. v. Advanced Tooling Specialists, Inc., 206 Wis. 2d 435, 442, 557 N.W.2d 835 (1996) (citing Racine v. Weisflog, 165 Wis. 2d 184, 190, 477 N.W.2d 326 (Ct. App. 1991)). An officer "is vested with policy-making authority or has the ability to make decisions which bind the company." Modern Materials, 206 Wis. 2d at 444.

14

¶29 An officer also may be an employee. Those employees who are not officers may or may not have management functions that are performed for the employer, depending on the business structure of the employer. See Burbank Grease Servs., LLC v. Sokolowski, 2006 WI 103, ¶3, 294 Wis. 2d 274, 717 N.W.2d 718. An employee, acting within the scope of his employment, may incur liability for his employer. Milwaukee Transp. Servs., Inc. v. Family Dollar Stores of Wis., Inc., 2013 WI App 124, ¶8, 351 Wis. 2d 170, 840 N.W.2d 132.

¶30 An agent has a fiduciary relationship with his principal. The Restatement (Second) of Agency defines "agency" as: "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). A fiduciary relationship is a consensual relationship where the agent voluntarily places the interests of his principal before his own interests. Zastrow v. Journal Commc'ns, Inc., 2006 Wis. 72, ¶28, 291 Wis. 2d 426, 718 N.W.2d 51. Under certain circumstances, an agent acting within the scope of his agency can bind his principal. Arsand v. City of Franklin, 83 Wis. 2d 40, 48-49, 264 N.W.2d 579 (1978).

¶31 An agent may be either an employee or an independent contractor. Romero v. West Bend Mut. Ins. Co., 2016 WI App 59, ¶39, 371 Wis. 2d 478, 885 N.W.2d 591 (citing Arsand, 83 Wis. 2d at 48-49). An independent contractor is one "who contracts with

15

another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct." Restatement (Second) of Agency § 2(3) (1958). "[A]n independent contractor may or may not be an agent." Romero, 371 Wis. 2d 478, ¶40.

> This means that when an independent contractor has no fiduciary obligations to and is not subject to control by the principal, no agency relationship has formed. However, despite the lack of physical control over an independent contractor, an agency relationship may still exist when the fiduciary relationship has formed and the principal has control over certain activities.

Id. (citation omitted). Examples of independent contractors include "the attorney at law, the broker, the factor, the auctioneer, and other similar persons employed either for a single transaction or for a series of transactions . . . ." Arsand, 83 Wis. 2d at 48 (citing Meyers v. Matthews, 270 Wis. 453, 467, 71 N.W.2d 368 (1955)). They also are agents because they have a fiduciary relationship with their principal, who has the right to control their acts that are done within the scope of the agency. Romero, 371 Wis. 2d 478, ¶42.

¶32 Although the precise issue before us is one of first impression, we often have examined the scope of a principal's control of another when determining whether that person (or organization) is an agent of the principal. As the court of appeals recently said, "[an] important factor in determining whether a person is an agent is the extent of control retained over the details of the work." Id., ¶38 (citing Kablitz v. Hoeft, 25 Wis. 2d 518, 521, 131 N.W.2d 346 (1964)).

16

¶33 In Romero, the court of appeals examined whether an employee of Badger State Auto Auction, Inc., who injured three men while driving a vehicle Badger State was preparing to auction for Fairview Auto, Inc., was an officer, agent, or employee of Fairview. The court of appeals determined that the driver was not an agent of Fairview because, although Fairview exercised control over Badger State with respect to the terms for auctioning the vehicles, Fairview had no right to control the movement of vehicles which was the conduct that caused the harm. Romero, 371 Wis. 2d 478, ¶42.

¶34 In order to secure governmental immunity under Wis. Stat. § 893.80(4), the governmental entity must have established reasonably precise standards of control for the task at issue and the person who is performing the task must be adhering to those standards at the time of the accident. Showers Appraisals, LLC v. Musson Bros., 2013 WI 79, ¶37, 350 Wis. 2d 509, 835 N.W.2d 226. However, absent "reasonably precise specifications" established by the governmental body, there could be neither control nor the right to control the conduct that caused the injury. Id.

¶35 In Kablitz v. Hoeft, we considered whether an orthopedic surgeon who had been retained by defendant insurance company's counsel as an independent contractor to examine the extent of plaintiff's injury, was an agent of the insurance company. In concluding that he was not, we stated "[t]here was no proof [] that Farmers Mutual reserved any right to control

17

the details of the examination or exerted any influence over such examination." Kablitz, 25 Wis. 2d at 521.

¶36 The above decisions demonstrate the basic principles of agency law in the State of Wisconsin. To summarize, an agent is one who acts on behalf of and is subject to reasonably precise control by the principal for the tasks the person performs within the scope of the agency. Whether an independent contractor is an agent is a fact-specific inquiry. We therefore turn to the facts of the present case, and apply these principles accordingly.

### 3. Application

¶37 It is evident from the record before us that Creekside's employees were not the employees of Conference Point and that Conference Point did not control or attempt to control the physical conduct of Creekside's employees. Rather, Creekside was an independent contractor, hired by Conference Point to complete tree-trimming work in identified locations on Conference Point's property. To determine whether Creekside was the agent of Conference Point for the tree-cutting that caused the injury, we focus on the level of control that Conference Point either exerted or had the right to exert over the tree-cutting task that caused the injury. We give particular attention to whether the injury-causing conduct occurred when Creekside was following Conference Point's specific directions.

¶38 We conclude that no facts were presented supportive of the conclusion that Conference Point either controlled or had

18

the right to control the details of Creekside's work. Accordingly, Creekside was not Conference Point's agent within the meaning of Wis. Stat. § 895.52.

¶39 The following undisputed facts support our conclusion. First, the written agreement between Conference Point and Creekside described the work to be done on the east shoreline where Jane was injured in general terms. No means or methods were set out in regard to how "Removal of 10 dead or hazardous trees, on hill or overhanging shoreline path, to grade level" was to be accomplished, or in regard to how "Pruning to reduce weight for trees overhanging water's edge or to improve structure/reduce competition" were to be undertaken.

¶40 Second, Gaasrud testified that he left the "means and methods" for conducting the tree-trimming, including any safety precautions, to Creekside. Gaasrud had no training, experience, or knowledge regarding how a tree-trimming company should operate, and although he notified Creekside that the path was public, he testified at his deposition that monitoring pedestrian traffic was "[Creekside's] determination." Conference Point did not assign anyone to oversee Creekside's work, nor did Conference Point provide any tools, equipment, or assistance to Creekside. Moreover, Gaasrud was not aware Creekside would be working on the day of the accident.

¶41 The court of appeals correctly analyzed the undisputed material facts when it concluded that Creekside was not an agent of Conference Point:

19

> From the decision regarding whether or not to use a rope to bring down the branch that killed Jane, to where safety cones would be placed, to how "spotters" would be utilized, the record is clear that Creekside, not Conference Point, maintained control over the details of its work, particularly the actions that led to Jane's death.

Westmas, 372 Wis. 2d 683, ¶21.

¶42 These factors demonstrate that not only did Conference Point lack control over Creekside's tree-trimming, but it also lacked the right to control the details of Creekside's tree-trimming. In its analysis, the court of appeals discussed whether Conference Point had "the right to control the tasks performed by [Creekside] with 'reasonably precise specifications.'" Id., ¶16 (quoting Showers, 350 Wis. 2d 509, ¶37). While recognizing that an agent could be an independent contractor, the court of appeals correctly concluded that Creekside was not an agent of Conference Point because Conference Point did not control, or have the right to control, the means or methods of the work that caused the injury. We agree with this conclusion. With no background or knowledge on how to perform tree-trimming, Conference Point could not have controlled or had the right to control the methods of work including safety specifications employed for tree-trimming. All Conference Point could do was describe the "vision and concept" of the project, which it did. It was left to Creekside to decide the specifics of how the tree-trimming would be accomplished.

¶43 Creekside contends that the court of appeals' decision will summarily deny agency status, and therefore immunity, to

20

all independent contractors of a landowner who lacks employees with the expertise to control and supervise the details of the contractor's work. This argument is unpersuasive. As the court of appeals acknowledged, whether an independent contractor is an agent is a fact-bound inquiry. Westmas, 372 Wis. 2d 683, ¶16.

### 4. Statutory "owner"

¶44 We now turn to Creekside's alternate argument, namely, whether Creekside qualifies as a statutory owner because it occupied Conference Point's property within the meaning of Wis. Stat. § 895.52(1)(d)1. Our decision in Roberts v. T.H.E. provides guidance for applying the term "occupies" within the recreational immunity context.

¶45 In Roberts, plaintiff was injured when one of the lines tethering a hot air balloon to the ground snapped, causing the basket of the balloon to collide with Roberts, knocking her to the ground. Roberts, 367 Wis. 2d 386, ¶10. Roberts had been attending a charity event sponsored by Green Valley Enterprises and hosted on a shooting range owned by Beaver Dam Conservationists, LLC. Id., ¶5. Sundog Ballooning, LLC, was the owner and operator of the hot air balloon providing tethered rides at the event. Id., ¶6. On review, we considered whether Sundog had "occupied" the shooting range such that Sundog was a statutory owner and thereby entitled to recreational immunity under Wis. Stat. § 895.52(1)(d)1.

¶46 We began our discussion in Roberts by acknowledging that the definition of "occupy" in the context of recreational

21

immunity is "to take and hold possession." Id., ¶34 (citing Doane v. Helenville Mut. Ins. Co., 216 Wis. 2d 345, 355, 575 N.W.2d 734 (Ct. App. 1998)). In Doane, the court of appeals explained that the term "occupy" as it is used in Wis. Stat. § 895.52 requires "a degree of permanence, as opposed to the mere use of the property in question." Doane, 216 Wis. 2d at 351.

¶47 In Roberts, we also noted that the purpose of the recreational immunity statute is to encourage landowners to open land for public use. Defining Sundog as an occupier "would not further the policy which underlies the statute . . . because the . . . property was already open for public recreational purposes." Roberts, 367 Wis. 2d 386, ¶35. This is so because regardless of whether Sundog was immune, the owner of the property, Beaver Dam Conservationists, was protected and would therefore not be discouraged from opening its land to the public.

¶48 In the present case, we agree with Westmases that Creekside's presence on Conference Point's property did not exceed "mere use" and did not approach "a degree of permanence," nor did it have any effect on whether Conference Point's property would be open to the public for recreational purposes. As the court of appeals correctly explained:

> In the few days it was on the property, Creekside moved from temporary location to temporary location for the limited purpose of trimming trees as needed to satisfy its contract with Conference Point. Furthermore, Creekside was "not responsible for

22

> opening up the land to the public," and indeed did not have authority to do so.

Westmas, 372 Wis. 2d 683, ¶27 (footnote omitted). Based on these uncontested facts, we conclude that Creekside was not an occupier of the Conference Point property and is therefore not a statutory owner of the property for purposes of Wis. Stat. § 895.52.

### C. Limits of Recreational Immunity

¶49 Although we conclude that the definitions of "agent" and "occupies" to be plainly discernible from the statutory context in which they occur, we nevertheless consult legislative history underlying Wis. Stat. § 895.52 to confirm our plain meaning interpretation. As discussed above, we note that § 895.52 was enacted to limit the liability of property owners in order to encourage them to open their lands to the public for recreational purposes. Our statutory interpretation and application above are consistent with that purpose.

¶50 Creekside argues that any limitation on the definition of "owner" will undermine the purpose of the statute. We disagree. Although we have previously stated that the statute is to be liberally construed in favor of immunity, we have likewise concluded that this immunity is not absolute. See, e.g., Roberts, 367 Wis. 2d 386, ¶39; Linville v. City of Janesville, 184 Wis. 2d 705, 719, 516 N.W.2d 427 (1994).

¶51 In Linville, we considered whether granting immunity to city paramedics would create limitless immunity for all medical services provided for injuries sustained while engaging

in a recreational activity at a City-owned pond. Id. at 718 (citing Ervin, 159 Wis. 2d at 472-76).[9] In Linville, we narrowed the focus of our inquiry to "whether the City as employer of the paramedics is, in the eyes of the law, the same entity that owns the Pond." Linville, 184 Wis. 2d at 718. We concluded that "[e]xtending immunity to landowners for negligently performing in a capacity unrelated to the land or to their employees whose employment activities have nothing to do with the land will not contribute to a landowner's decision to open the land for public use." Id. at 719.

> In addition, granting immunity to the landowner when the landowner and the employer of the negligent employee are functioning in two different capacities and are therefore not the same entity in the eyes of the law would produce absurd consequences. In Ervin, we stated that the statute was intended to "shif[t] some of the risk of injury from the landowner to the entrant." But, it "was not enacted to provide indiscriminate immunity for landowners without regard to possible consequences."

Id. (citation omitted).

¶52 We therefore concluded that to interpret Wis. Stat. § 895.52(2)(b) to extend immunity to negligent rescue and treatment efforts by paramedics would produce absurd consequences, including the possibility that a health care provider employed by the City would remain immune even if he or

---

[9] In Ervin, we concluded that Wis. Stat. § 895.52 granted immunity to landowners with respect to the condition of the land and to the landowners' (or its employees') actions with respect to the land. Ervin v. City of Kenosha, 159 Wis. 2d 464, 472-76, 464 N.W.2d 654 (1991).

she provided negligent care once the victim had been transported to the hospital. Id. at 720.

¶53 Here, it was Conference Point that was responsible for opening the land to the public, not Creekside. As we stated in Roberts, "[g]ranting immunity to third parties that are not responsible for opening up the land to the public is unsupported by our prior case law." Roberts, 367 Wis. 2d 386, ¶41. Further, the legislature has expressly stated that the purpose of Wis. Stat. § 895.52 is to limit liability of property owners under circumstances "in which the owner does not derive more than a minimal pecuniary benefit." 1983 Wis. Act. 418, § 1. Given these observations, denying immunity to Creekside does not conflict with the legislative history or purpose of § 895.52, nor does it contravene the legislature's mandate to interpret the statute broadly in favor of landowners.

### III. CONCLUSION

¶54 There were two issues on this review. First, we considered whether Creekside, as the entity hired by Conference Point to complete the tree-trimming project, is protected as an "agent" of Conference Point under Wis. Stat. § 895.52(2)(b). Section 895.52(2)(b) provides that "no owner and no officer, employee or agent of an owner is liable for the death of, any injury to, or any death or injury caused by, a person engaging in a recreational activity on the owner's property." The second issue was whether Creekside is entitled to recreational immunity as an occupier of the Conference Point property, such that it

was a statutory "owner" of the property at the time of the accident. "Owner" is defined to include "[a] person . . . that owns, leases or occupies property." § 895.52(1)(d)1.

¶55 As to the first issue, we conclude that Creekside was not an agent of Conference Point because Conference Point had neither control of, nor the right to control, the details of Creekside's work, including the acts that caused injury to Jane Westmas. We further conclude that Creekside was not an occupier of Conference Point's property because its presence on the property exhibited no "degree of permanence, as opposed to mere use."

¶56 Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶57 SHIRLEY S. ABRAHAMSON, J., withdrew from participation.

¶58 REBECCA GRASSL BRADLEY, J. and DANIEL KELLY, J. *(dissenting)*. Jane Westmas' death was tragic. Occurring in front of her son as they walked along an ordinarily idyllic lakeshore path, a tree branch cut by Creekside Tree Service, LLC suddenly crashed down upon her, causing fatal injuries. If tragic circumstances controlled our decisions, we would join the court's opinion. However, this case, like all others, must be decided based on the law.

¶59 This case presents a statutory question of law: is Creekside entitled to recreational immunity under Wis. Stat. § 895.52(2)(b) because it qualifies as either an "agent" under § 895.52(2)(b), or as an "owner" by "occup[ying]" Conference Point's property under § 895.52(1)(d)(1)? The court concludes Creekside is neither and therefore not immune from liability. But it reaches that decision by overlooking one branch of the definition of "agent" and disregarding the plain meaning of "occupies." In doing so, the court perpetuates its preference for a narrow scope of immunity not reflected in the words of the law we interpret. Because we would instead apply the broad scope of immunity chosen by the legislature, we respectfully dissent.

I. CREEKSIDE WAS AN "AGENT"

¶60 An agency relationship exists, as relevant to this case, when one person either controls or has the right to control the activity of another. If such a relationship existed between Conference Point and Creekside, then the latter would enjoy the same immunity as the former under Wis. Stat. § 895.52.

1

We believe such a relationship did exist, and so Creekside was entitled to immunity in this case. The court reached the opposite conclusion because it focused almost exclusively on whether Conference Point actually controlled Creekside. Because it performed no meaningful analysis of whether Conference Point had the right to control Creekside, it overlooked the agency relationship that undoubtedly obtained between the two.

## A. Agency Principles

¶61 As the court correctly noted, Wis. Stat. § 895.52 does not tell us who qualifies as an "agent." When the statute we are applying provides no working definition, we frequently look for one in the Restatement of Agency. We did just that in Meyers v. Matthews, 270 Wis. 453, 467, 71 N.W.2d 368 (1955), where we observed that an agent can be either a "servant" or an "independent contractor." An agent, we said, is:

> a person authorized by another to act on his account and under his control. Included within its meaning are both those who, whether or not servants . . . act in business dealings and those who, being servants, perform manual labor. An agent may be one who, to distinguish him from a servant in determining the liability of the principal is called an independent contractor. Thus, the attorney at law, the broker, the factor, the auctioneer, and other similar persons employed either for a single transaction or for a series of transactions are agents, although as to their physical activities, they are independent contractors.

Id. (emphasis omitted) (quoting Restatement of Agency ch. 1, topic 1, § 1 cmt. d (Am. Law Inst. 1933)).

¶62 The court has held, frequently, that an agency relationship exists when the principal "controls" or has the

2

"right to control" the agent's actions. "In determining whether agency exists, the matter of control or the right of control, by the person alleged to be the principal over the person alleged to be the agent, is deemed of great importance by the courts." Renich v. Klein, 230 Wis. 123, 127, 283 N.W. 288 (1939). That is to say, a principal is one who "has the right to control the conduct of the agent with respect to matters entrusted to him. . . . " Id. at 128 (quoting Restatement of Agency ch. 1, topic 3, § 14 (Am. Law Inst. 1933)); see also Schmidt v. Leary, 213 Wis. 587, 590, 252 N.W. 151 (1934) (finding agency because "[t]he plaintiff as the owner of the car had the right to control the actions of the driver in driving it on the trip, whether she had occasion to exercise it or not."); Arsand v. City of Franklin, 83 Wis. 2d 40, 49, 264 N.W.2d 579 (1978) ("[I]t was necessary for the [plaintiff] to allege and prove that . . . the City controlled or had the right to control [the tortfeasor's] physical conduct in the performance of his services.").

¶63 The court's opinion went awry because it focused on whether Conference Point actually controlled Creekside's activities to the exclusion of any meaningful inquiry into whether the former had the right to control the latter. "Control" and the "right to control" are not the same things, and either one is sufficient to create an agency relationship. The court has said so before. In Schmidt we had to decide whether the driver of a car was the agent of the owner, who was a passenger. 213 Wis. at 588. If actual control were the sine

3

qua non of an agency relationship, the answer would have been a simple and obvious "no." If the passenger had actually exercised control——which would mean, in that context, manipulating the automobile's steering, acceleration, and braking systems——the passenger wouldn't have been the passenger, but the driver. And yet we concluded the driver was nonetheless the passenger's agent, because the passenger had the right to control operation of the vehicle, <u>regardless of whether she exercised it</u>: "The plaintiff as the owner of the car had the right to control the actions of the driver in driving it on the trip, whether she had occasion to exercise it or not." <u>Id.</u> at 590.

¶64 The court said essentially the same thing in <u>Gehloff v. De Marce</u>, 204 Wis. 464, 234 N.W. 717 (1931). There, the defendant asked a neighbor to drive a car on a business errand, during which an accident occurred. <u>Id.</u> at 464-65. If liability were to attach, the court said, it would be via an agency relationship. <u>Id.</u> at 465. It said the driver was the defendant's agent because the defendant had "the right of control and direction" of the vehicle. <u>Id.</u> It was undisputed that the defendant was not present in the car at the time of the accident, <u>see id.</u>, so the court was quite obviously not limiting agency to situations in which the principal actually "exerted control."

¶65 Indeed, it is the right to control that explains the Restatement's description of the "independent contractor" relationship. In such relationships, there are two components——

4

the purpose for which the contractor was retained, and the physical activity in which he engages to accomplish that purpose. As the Restatement says, he is an agent with respect to the former, but not the latter: "Thus, the attorney at law, the broker, the factor, the auctioneer, and other similar persons employed either for a single transaction or for a series of transactions are agents, although as to their physical activities, they are independent contractors." See Meyers, 270 Wis. at 467 (quoting Restatement of Agency ch. 1, topic 1, § 1 cmt. d (Am. Law Inst. 1933)). It is the attorney and broker's representation, and the factor[1] and auctioneer's financial arrangements, that the principal has the right to control. Consequently, with respect to those matters, the actors relate to each other and the world as principal and agent (as the Restatement recognizes). But the physical actions of the attorney, broker, factor, and auctioneer are outside the contemplation of the contractual relationship, which puts them beyond the right to control and, consequently, the agency relationship.

¶66 The court, however, appears to be intent on reading the "right to control" branch of the agency analysis out of our jurisprudence. In narrowing the inquiry to merely the "control" branch, the court relies on our government immunity line of

---

[1] Factor, Black's Law Dictionary (10th ed. 2014) ("[a]n agent who is employed to sell property for the principal and who possesses or controls the property; a person who receives and sells goods for a commission").

cases in which we describe who qualifies as an agent under Wis. Stat. § 893.80(4). But those cases have no explanatory power here because they are trying to identify something entirely different——something that is defined (erroneously, in our view) by the principal's exercise of control. Governmental immunity exists for "the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." § 893.80(4). Notwithstanding this language, the court has concluded that what the statute really protects is the exercise of governmental discretion. Lodl v. Progressive N. Ins. Co., 2002 WI 71, ¶21, 253 Wis. 2d 323, 646 N.W.2d 314 ("The statute immunizes against liability for legislative, quasi-legislative, judicial, and quasi-judicial acts, which have been collectively interpreted to include any act that involves the exercise of discretion and judgment." (first citing Willow Creek Ranch, L.L.C. v. Town of Shelby, 2000 WI 56, ¶25, 235 Wis. 2d 409, 611 N.W.2d 693; then citing Kierstyn v. Racine Unified Sch. Dist., 228 Wis. 2d 81, 90, 596 N.W.2d 417 (1999); then citing Scarpaci v. Milwaukee Cty., 96 Wis. 2d 663, 683, 292 N.W.2d 816 (1980); then citing Lifer v. Raymond, 80 Wis. 2d 503, 512, 259 N.W.2d 537 (1977))). Therefore, if only governmental discretion is entitled to immunity, then it necessarily follows that the government's agents receive no immunity to the extent they exercise their own discretion. So the test we developed to identify which government agents were entitled to immunity focused on how much control the government actually exercised over the agent. Immunity attaches, we said, only so long as "the governmental

6

entity approved reasonably precise specifications that the governmental contractor adhered to when engaging in the conduct that caused the injury . . . ." Showers Appraisals, LLC v. Musson Bros., 2013 WI 79, ¶37, 350 Wis. 2d 509, 835 N.W.2d 226. In other words, there is immunity only when the government entity exercised enough actual control over the agent that it would be accurate to say the agent was not exercising his own discretion.

¶67 That test has nothing to say in the recreational immunity context. Here, immunity relates to a duty, not the exercise of governmental authority. Recreational immunity relieves a person from the duty to "keep the property safe for recreational activities[;] . . . inspect the property[; . . . and] . . . give warning of an unsafe condition, use or activity on the property." Wis. Stat. § 895.52(2)(a). So there is no need to locate the exercise of discretion in either the owner or the agent, because the exercise of discretion does not define the thing entitled to immunity under this statute. And because the inquiry into control was important in the governmental immunity context only for the purpose of identifying who exercised discretion, there is no necessary connection between control and agency in the recreational immunity context.

B. Application

¶68 If the court had analyzed this matter under the "right to control" rubric, the conclusion that Creekside was Conference Point's agent would have followed as a matter of course.

7

Conference Point authorized Creekside to enter the property and trim certain trees that met the conditions specified by Conference Point. And Creekside agreed to trim the trees described by those conditions. Nothing in the contract gave Creekside the right to refuse Conference Point should it decide to change the description of the trees to be trimmed, when they would be trimmed, the safety precautions to take when trimming, the state of pedestrian traffic when they were trimmed, or any other relevant aspect of Creekside's activity. That is to say, there is nothing in the contract to suggest that Conference Point ceded the right to control activity taking place on its own property, a right vouchsafed to it by ancient principles of real property law. Indeed, even the court had to recognize the contract did no such thing: "The bid provided no details about how these tasks were to be accomplished." Majority op., ¶7.

¶69 But we need not rely just on the contract's silence with respect to Conference Point's right to control Creekside's activities. The record reveals not only that Creekside acknowledged Conference Point's right to control activity on its own property, but that it actually expected Conference Point to exercise it. Jonathan Moore, Creekside's sales consultant and foreman, expected that Conference Point would take affirmative steps to ensure pedestrian safety by redirecting traffic or otherwise alerting pedestrians to the danger posed by the tree trimming. Further, it was his understanding that, with respect to certain safety precautions, such as shutting the path to pedestrian traffic, the "right to control" rested with

8

Conference Point, not Creekside. There is no evidence in the record——none——to contradict this.

¶70 The court's reference to the "right to control" branch of agency law was so spartan that it lacked any analysis. Here is the whole of its attention to this, the dispositive issue: "These factors demonstrate that not only did Conference Point lack control over Creekside's tree-trimming, but it also lacked the right to control the details of Creekside's tree-trimming." Majority op., ¶42. To which factors was the court referring?

- The contract's silence with respect to the right to control (Majority op., ¶39);

- Creekside's exercise of control over its activities (Majority op., ¶40); and

- Conference Point's lack of expertise in tree-trimming (Majority op., ¶¶41-42).

These factors all share two salient characteristics. First, they are conceptually incapable of affecting Conference Point's right to control Creekside's activities on its own property. And second, they lack any accompanying analysis to explain how they are supposed to accomplish the effect the court ascribes to them.

¶71 Under the best of circumstances, it's really difficult to tease meaning out of silence. Here, the court discerned in it some truly remarkable conclusions. In the silence, the court heard Conference Point tender to Creekside unfettered control and occupancy of its property for the purpose of tree-trimming whenever and in whatever manner Creekside might choose. If a Conference Point employee had perceived the danger into which

9

Mrs. Westmas was walking, presumably this contractual silence would have prevented him from ordering Creekside to temporarily halt its work until Mrs. Westmas had passed. Or, if there were peaks and valleys in pedestrian traffic, Creekside could have used this silence to rebuff an instruction to trim only during certain times of the day. Or Creekside could have told Conference Point to mind its own business if it had said that no tree-trimming could take place until Conference Point barricaded the path. In silence, the court discerned the type of exclusive control over real property that normally requires a tenancy agreement or a deed.

¶72 The second factor on which the court relied is not even in the right category of considerations. The fact that Conference Point did not actually exercise control is irrelevant as a matter of law——the whole point of analyzing the "right to control" is to consider the existence of an agency relationship when no such control occurred. If the right to control exists, then even when Conference Point doesn't exercise it, Creekside would nonetheless be "a person authorized by [Conference Point] to act on his account and under his control . . . ." See Meyers, 270 Wis. at 467 (quoting Restatement of Agency ch. 1, topic 1, § 1 cmt. d (Am. Law Inst. 1933)). So, pace the court's conclusion, the absence of actual control does nothing but signal it is time to start the "right to control" analysis, something the court didn't do.

¶73 The court's reliance on Conference Point's lack of tree-trimming expertise is also a category error. If Conference

10

Point had endeavored to tell Creekside how to trim trees, it is certainly possible, and maybe even likely, that its lack of expertise would cause it to exercise that control unwisely, or ineffectually. But lack of competency does not negate the right to control, it just makes it imprudent. And apropos of that point, let's not forget that the danger presented in this case has nothing to do with expertise in tree-trimming. It is the danger of a heavy object falling on someone walking by. There is no gnosis passed down through generations of tree-trimming guilds about the implications of heavy branches falling to the ground. This danger, and the means of avoiding it, are known to quite literally everyone: Do not be where the branch falls. In any event, nothing in the court's opinion describes how Conference Point could even conceivably lose the right to control activity on its own property just because it might exercise that control in a less than optimal manner.

¶74 So the extent of the court's "right to control" analysis was a bare, analysis-free reference to three factors that have nothing to do with Conference Point's right to control activities on its own property. Because nothing in the contract or the circumstances presented to us suggest that Conference Point relinquished that right, a right it owns as a matter of real property law, Creekside was its agent.

¶75 We find confirmation for our conclusion in the reasons the court gave for finding agency in Gehloff—specifically, the relationships between the principal, agent, and injury-causing instrument. Gehloff observed:

> The rule is accepted in this state that, where a plaintiff seeks to hold the owner of a car liable for injuries inflicted when the car was being operated by another, proof of the ownership makes out a prima facie case. This is on the theory that the fact of ownership justifies an inference or raises a presumption that the driver of the car is the agent of the owner and that he is driving it in pursuit of the owner's business.

Gehloff, 204 Wis. at 465-66.

¶76 The relationships between the owner, the agent, and the injury-producing object in Gehloff were exactly as they are here. Conference Point owned the property and the fatality-causing tree limb——just as Mrs. Kandler owned the car in Gehloff.[2] Conference Point asked Creekside to trim trees for Conference Point's own benefit——just as the driver was asked to drive the car for the owner's benefit. And Mrs. Westmas died when Creekside cut the limb from a tree owned by Conference Point on Conference Point's property, just as injury followed from the manner in which the agent drove Mrs. Kandler's car in Gehloff. The Gehloff court said that when a person uses the owner's property for the owner's purposes, and in the process of doing so causes injury to another, there arises a presumption of agency. And that was quite apart from any question of whether the principal exercised actual control over the agent.

---

[2] We refer to Mrs. Kandler as the car's owner, although technically it belonged to her son and was on loan to her at the time of the accident. Nonetheless, for purposes of our analysis in Gehloff v. Kandler, 204 Wis. 464, 234 N.W. 717 (1931), Mrs. Kandler stood in the shoes of the owner, so we will not make any further distinction here.

12

¶77 Conference Point either had the right to control Creekside's activity, or it did not. If it did, then Creekside was an agent. But if Creekside's authority was so perfectly exclusive that Conference Point had no right or ability to interfere with its work, then it necessarily follows that Creekside occupied Conference Point's property while it pruned the trees.

## II. CREEKSIDE WAS AN "OWNER"

¶78 The court should have adopted the plain meaning of "occupies" articulated in the dissent from Roberts v. T.H.E. Ins. Co., 2016 WI 20, 367 Wis. 2d 386, 879 N.W.2d 492 (R. G. Bradley, J., dissenting). Instead, the court requires Creekside to both establish a "degree of permanence" on Conference Point's property and play a role in opening the property to the public for recreational purposes. Majority op., ¶54-55. The court imposes these obstacles to immunity not by construing the statutory text, but instead by consulting legislative history and prior case law that likewise disregards the actual words enacted by the legislature. Just like the defendant in Roberts, Creekside meets the ordinary and accepted meaning of "occupies," entitling it to the immunity the court erroneously denies it.

### A. Plain Meaning of "Occupies"

¶79 In Roberts, this court held that Sundog Ballooning, LLC, which provided hot air balloon rides on land open to the public for recreational purposes, was not entitled to statutory immunity as an "owner" under Wis. Stat. § 895.52(2)(b) when a hot air balloon struck and injured Patti Roberts while she was

13

engaged in a recreational activity. Roberts, 367 Wis. 2d 386, ¶¶25-41. Sundog argued it was an occupier entitled to immunity by virtue of § 895.52(1)(d)(1)'s definition of "owner," which includes "[a] person . . . that . . . occupies property," particularly because "Wisconsin courts have concluded private organizations hosting an event on land they did not own are entitled to recreational immunity." Id., ¶30 (citing Hall v. Turtle Lake Lions Club, 146 Wis. 2d 486, 487-90, 431 N.W.2d 696 (Ct. App. 1988)). The Roberts court rejected Sundog's argument by eschewing the plain meaning of "occupies" in favor of a definition gleaned from case law advancing a cramped view of what it means to occupy land, one that finds no support in the statute's text.

¶80 The Roberts court relied on the statute's stated "[l]egislative intent," expressed in the legislative history of 1983 Wis. Act 418, to contravene the plain meaning of "occupies." As divined by the Roberts court, that legislative purpose seeks "to limit liability in order to encourage property owners to open their lands to the public."[3] Id., ¶28. The court

---

[3] The full text of 1983 Wis. Act 418, § 1, reads:

The legislature intends by this act to limit the liability of property owners toward others who use their property for recreational activities under circumstances in which the owner does not derive more than a minimal pecuniary benefit. While it is not possible to specify in a statute every activity which might constitute a recreational activity, this act provides examples of the kinds of activities that are meant to be included, and the legislature intends that, where substantially similar circumstances or activities exist, this legislation should be liberally

(continued)

14

refused to "grant[ ] immunity [under Wis. Stat. § 895.52(2)(b)] to a third party not responsible for opening up the land to the public." Id., ¶33 (footnote omitted). Adopting the court of appeals' definition from Doane v. Helenville Mut. Ins. Co., the Roberts court concluded "occupies" meant "to take and hold possession," which in the court's view necessitates a person or entity not only to open the land to the public, but also to achieve "a degree of permanence, as opposed to mere use" thereon. Id., ¶34 (quoting 216 Wis. 2d 345, 355, 575 N.W.2d 734 (Ct. App. 1998)).

¶81 Applying this court-created rule, the court in Roberts held that Sundog did not open the land to the public. Id., ¶41. Rather, it identified the event organizer as the entity that opened the land and the only one entitled to the classification of occupier.[4] Id., ¶37. Holding this element to be dispositive, the court did not reach the issue of whether Sundog attained the requisite "degree of permanence" on the property.

¶82 The Roberts dissent determined that "Sundog meets the statutory requirements to obtain recreational immunity because . . . it falls within the definition of 'owner,' which

---

construed in favor of property owners to protect them from liability.

[4] The court also identified the titled owner of the property as one with the responsibility of opening the land, cloaking it too with statutory immunity. Roberts v. T.H.E. Ins. Co., 2016 WI 20, ¶37, 367 Wis. 2d 386, 879 N.W.2d 492.

includes 'a person . . . that . . . occupies property.'"[5] Id., ¶132 (R. G. Bradley, J., dissenting). Undertaking a plain-meaning analysis, the dissent ascertained the ordinary and accepted meaning of "occupies" from the dictionary definition of "occupant," as "[o]ne that resides in or uses a physical space." Id., ¶134 (citing Occupant, The American Heritage Dictionary of the English Language (5th ed. 2015)). "There is no temporal requirement embedded in the definition of occupy." Id., ¶144. Nor is immunity limited "to those who 'host' or 'organize' an event on the land." Id. Instead, "a person who occupies property is one who has actual use of the property." Id., ¶134. Under § 895.52(2)(b), such an occupier is not "liable for the death of . . . a person engaging in a recreational activity" on the occupied property.

¶83 This definition was first adopted in Hall, 146 Wis. 2d at 491. One who "occupies" property includes:

> persons who, while not owners or tenants, have the actual use of land. . . . While "occupant" includes [an] owner and lessee, it also means one who has the actual use of property without legal title, dominion or tenancy. In order to give meaning to [occupies],

---

[5] Justice David T. Prosser concurred in part and dissented in part. Id., ¶83 (Prosser, J., concurring in part, dissenting in part). His purpose in dissenting was "to reinforce the inexorable logic of Justice [Rebecca Grassl] Bradley's dissent." Id. Justice Prosser joined all but footnote 4 of Justice Rebecca Grassl Bradley's dissent. Id. Footnote 4 disagreed with the court that a hot air balloon was not "property" within the meaning of the statute. Id., ¶132 n.4 (R. G. Bradley, J., dissenting). Chief Justice Patience Drake Roggensack, author of the court's opinion in this case, joined Justice Prosser's separate writing without qualification. Id., ¶131 (Prosser, J., concurring in part, dissenting in part).

the term should be interpreted to encompass a resident of land who is more transient than either a lessee or an owner.

Id. (alteration in original) (emphasis added) (quoting Smith v. Sno Eagles Snowmobile Club, Inc., 823 F.2d 1193, 1197 (7th Cir. 1987)); see also Leu v. Price Cty. Snowmobile Trails Ass'n, Inc., 2005 WI App 81, ¶11, 280 Wis. 2d 765, 695 N.W.2d 889; Held v. Ackerville Snowmobile Club, Inc., 2007 WI App 43, ¶16, 300 Wis. 2d 498, 730 N.W.2d 428; Milton v. Washburn Cty., 2011 WI App 48, ¶9, 332 Wis. 2d 319, 797 N.W.2d 924.

¶84 The court of appeals in Doane, 216 Wis. 2d at 351-52, however, altered this longstanding definition of "occupies" to mean "has actual possession of the property," with the added requirement that one must achieve a "degree of permanence" on the property. As aptly stated by Justice David T. Prosser in his separate writing in Roberts, "[t]he court of appeals reached the correct decision in Doane, but it did so, at least in part, for the wrong reason." Roberts, 367 Wis. 2d 386, ¶101 (Prosser, J., concurring in part and dissenting in part). "Until Doane, no Wisconsin case had ever used the phrase 'degree of permanence.'" Id. As the court of appeals in Hall "never discussed 'a degree of permanence' because . . . Hall clearly sidestepped the 'permanence' part of the Seventh Circuit's opinion [in Smith v. Sno Eagles Snowmobile Club, Inc., 823 F.2d 1193 (7th Cir. 1987)]," the court in Doane was wrong to rely on Hall to support its adoption of the "degree of permanence" test. Id. Justice Prosser explained:

This court cannot adopt the "permanence" test from the Seventh Circuit decision without overruling Hall and

17

numerous other cases, and also effectively ruling that [the event organizer] did not "occupy" the property. If a "permanence" test disqualifies Sundog, it would disqualify [the event organizer] as well because [the event organizer] did not own or lease the property——it occupied the property. [The event organizer's] few extra hours of occupancy at the shooting range cannot realistically be viewed as being more "permanent" than Sundog's occupancy.

Id., ¶106.

¶85 The "degree of permanence" test created in Doane rests on shaky ground. Not only does the test deviate from prior case law, it violates the ordinary-meaning canon of construction, which instructs that "[w]ords are to be understood in their ordinary, everyday meanings . . . ." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012). The ordinary meaning of "occupies" implies no temporal element, much less one approaching permanence, to any degree.

¶86 Applying the plain meaning of "occupies," without reading into the statute a "degree of permanence" test invented by the court of appeals with no foundation in the statutory text, the Roberts dissent reasoned that by using the property to provide a recreational activity, Sundog occupied the property within the meaning of Wis. Stat. § 895.52(1)(d)(1). Roberts, 367 Wis. 2d 386, ¶135 (R. G. Bradley, J., dissenting). To hold otherwise "creates a distinction between Sundog on the one hand, and [the event organizer] and the [property owners] on the other, that is not only unsupported by the broad legislative purpose of the recreational immunity statute but wholly absent from the statutory definition of the term 'owner.'" Id., ¶138.

18

## B. Application

¶87 The Westmas court decides in a single conclusory paragraph that Creekside failed to establish either element of the new test the Roberts' court concocted, which requires a would-be occupier to both establish "a degree of permanence" on the property and have an effect on whether the property "would be open to the public for recreational purposes." Majority op., ¶48. First, the court concludes that Creekside's presence on the property never exceeded "mere use." Id. Rather, "[i]n the few days it was on the property, Creekside moved from temporary location to temporary location for the limited purpose of trimming trees as needed to satisfy its contract with Conference Point." Id. The court holds that by establishing only temporary sites of use on the same property over the course of consecutive days Creekside was not an occupier. Under the court's logic, we are left to wonder what "degree of permanence" even means. Would the court require Creekside employees to spend the night on the property to establish "a degree of permanence"? Would it require Creekside's operations to remain fixed in one place over the course of its contract with Conference Point? How would the court rule if Creekside spent 365 days at Conference Point but each day worked on a different tree? We cannot be sure. And neither can the court without creating new law that deviates further from the plain meaning of Wis. Stat. §§ 895.52(1)(d)(1) and 895.52(2)(b) in the court's ongoing quest to further limit the statutory scope of recreational immunity.

19

¶88 Second, the court determines "Creekside was 'not responsible for opening up the land to the public,' and indeed did not have authority to do so." Id. This conclusory assertion derives from another infirmity of the Roberts analysis, which forecloses immunity for anyone other than the titled owner once the land has been opened to the public. Of course, the actual text of the statute does no such thing.

¶89 Applying the plain meaning interpretation of "occupies" to mean "actually use," it is logically impossible to conclude that Creekside is anything other than an occupier of Conference Point's property. Creekside actually used Conference Point's property by establishing and maintaining its presence on the property during the execution of its contract with Conference Point, up until the date of the accident. It brought its tree-trimming supplies and set up the area along the lake shore path and elsewhere on the property to perform its services. It even went so far as to alert pedestrian traffic along the path that it was using the property to perform its services.

¶90 The court here, as in Roberts, relies heavily on legislative history to conjure a legislative "purpose" in support its denial of immunity for Creekside. However, the court's interpretive approach, as in Roberts, violates fundamental principles of statutory interpretation. First, "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." Scalia & Garner, supra ¶87, at 56. If language is ambiguous,

consideration of a statute's purpose may be helpful but "the purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires." Id. Importantly, the purpose of a statute "cannot be used to contradict text or to supplement it." Id. at 57. Here, the court uses legislative history to identify a statutory purpose that both contradicts and supplements the text.

¶91 Nevertheless, even the proffered legislative purpose of opening the land for public use cannot save the court's erroneous holding. The court cites Linville v. City of Janesville, 184 Wis. 2d 705, 719, 516 N.W.2d 427 (1994), for declining to extend immunity to entities that negligently perform services unrelated to the land: "Extending immunity to landowners for negligently performing in a capacity unrelated to the land or to their employees whose employment activities have nothing to do with the land will not contribute to a landowner's decision to open the land for public use." Majority op., ¶51. Here, Creekside's activity was incontrovertibly related to the land, as the trees to be trimmed are of course physically rooted in the land and tree trimming enhances the property's aesthetics, functionality, and indeed its usability for the public. In this regard, Creekside's services were akin to the groomers of snowmobile trails in Leu, which the court of appeals concluded were occupiers under the statute, in part because their work "makes it possible to maintain and expand Wisconsin's system of snowmobile trails." 280 Wis. 2d 765, ¶15. Similarly,

21

Creekside's tree-grooming services made it possible for the public to traverse the shoreline path on Conference Point's property.

¶92 Refusing to recognize immunity for Creekside may force companies like it to weigh the risk of liability to the public when performing their tasks, dissuading them from working at these sites. This could create a domino effect of discouraging landowners, like Conference Point, from opening their land to the public because of the unsafe conditions arising from neglected maintenance the landowner is unwilling, unable, or unqualified to perform.

¶93 The court's interpretation of "occupies" in Roberts reads substantial language into the text of Wis. Stat. §§ 895.52(1)(d)(1) and (2)(b). Neither "degree of permanence" nor "responsible for opening up the land to the public" appear anywhere in the applicable statute, much less as prerequisites for immunity to attach. Regrettably, the court perpetuates its erroneous constriction of recreational immunity in this case.

IV. CONCLUSION

¶94 The text of Wis. Stat. § 895.52 is plain. Here, Creekside was an agent subject to Conference Point's control of its activity. Additionally, the statutory definition of "owners" includes a person who "occupies" property, and Creekside occupied the property on which Jane Westmas tragically died while engaging in a recreational activity. By virtue of its status as Conference Point's agent or as an entity that "occupie[d]" Conference Point's property, Creekside is immune

22

from liability. The legislature chose to immunize entities like Creekside, a result the court may not like, but the only outcome the law allows.