COURT OF APPEALS
DECISION
DATED AND FILED

June 13, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP747**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV93

IN COURT OF APPEALS
DISTRICT III

---

BERNICE RUSSELL,

    PLAINTIFF-APPELLANT,

V.

CMFG LIFE INSURANCE COMPANY,

    DEFENDANT-RESPONDENT,

COVANTAGE CREDIT UNION,

    DEFENDANT.

---

APPEAL from an order of the circuit court for Langlade County: JOHN B. RHODE, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Bernice Russell appeals from an order dismissing her complaint on summary judgment after the circuit court determined that there was no coverage for her husband's death under a credit life insurance policy issued by CMFG Life Insurance Company (CMFG).   The policy provided coverage for all deaths, subject to an exclusion for deaths occurring within six months of the effective date of the policy and resulting "directly or indirectly" from a pre-existing condition.   It is undisputed that Russell's husband's death occurred within six months of the policy's effective date and resulted in part from a pre-existing condition.   Therefore, we agree with the circuit court that the policy exclusion for pre-existing conditions applies.   In addition, we reject Russell's argument that the policy provides coverage for her claim based on the application of the independent concurrent cause rule.   Accordingly, we affirm the circuit court's order.

## BACKGROUND

¶2    On July 28, 2017, Raymond and Bernice Russell[1] obtained a vehicle loan from CoVantage Credit Union and, at the same time, applied for a joint credit life insurance[2] policy issued through CMFG.   CoVantage was the group policyholder.[3]   The policy provided benefits in the event of a covered life event,

---

[1] Because Raymond and Bernice Russell share a surname, we will refer to the plaintiff-appellant, Bernice Russell, as "Russell" and her husband as "Raymond."

[2] Credit life insurance is defined as "insurance on the lives of borrowers or purchasers of goods in connection with specific loans or credit transactions when all or a portion of the insurance is payable to the creditor to reduce or extinguish the debt."   WIS. ADMIN. CODE § Ins 6.75(1)(a)1. (July 2022).

[3] CMFG issued a group credit insurance policy to CoVantage.   According to the terms of that policy, the terms and conditions "shown in the Certificate issued to insured Borrowers" "are incorporated into this policy by this reference."   For ease of reading, we will simply refer to the "certificate" issued to Russell under the group policy as "the policy."

defined as the insured's "death, accidental dismemberment, or certified diagnosis of a terminal illness." However, the policy included an exclusion for death resulting from a pre-existing condition. The exclusion provided that CMFG will not pay benefits if the covered life event "occurs within 6 months after the Effective Date" of the policy "and results directly or indirectly from a Pre-existing Condition," defined as "an illness, disease, or medical condition for which [the insured] received medical advice, consultation, or treatment within the 6 month period immediately prior to the Effective Date of Insurance."

¶3    On September 21, 2017, Raymond died after changing a flat tire on a 2014 Dodge Ram. According to the record, Raymond removed the 74.2-pound tire from the vehicle himself and placed it in the trunk of another vehicle to take it to be repaired. Sometime later, he became ill, began vomiting blood, was taken to the hospital by ambulance, and died at the hospital that evening. Raymond's death certificate listed his cause of death as "acute gastrointestinal hemorrhage" due to "complications of chronic ethanolism." (Formatting altered.) There is no dispute that Raymond was diagnosed with esophageal varices[4] on August 6, 2014; that esophageal varices were also noted in his medical records in July 2016 and on June 29, 2017; that he suffered from end-stage liver disease as a consequence of chronic alcohol abuse, among other medical concerns; and that he was awaiting a liver transplant at the time of his death.

---

[4] A varix—the singular of varices—is defined as "[a] tortuous dilatation of a vein," or "[l]ess commonly, dilatation of an artery or lymph vessel." *Varix*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (19th ed. 2001). Thus, an esophageal varix is "[a] tortuous dilatation of an esophageal vein, esp. in the distal portion." *Esophageal Varix*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (19th ed. 2001). An esophageal varix "results from any condition that causes portal hypertension, typically cirrhosis of the liver." *Id.* "If an esophageal varix bursts, massive hemorrhage occurs, and the patient may die within minutes." *Id.*

¶4     On October 30, 2017, Russell filed a claim for life insurance benefits under the CMFG policy as a result of Raymond's death.  During its claim investigation, CMFG received Raymond's medical records, which revealed that Raymond's internal bleeding was "likely" the result of the "varices" with which he had previously been diagnosed.  The records further revealed that Raymond had been treated for "cirrhosis and varices" within the six months prior to his death.  Raymond's physician also provided a "Health Care Provider's Statement," which asserted that the "[c]ondition[] which caused or contributed to death" was an "[u]pper [gastrointestinal] bleed, with end[-]stage liver disease."  The physician also averred that Raymond "receive[d] medical advice, consultation or treatment" for this condition between January 29, 2017, and July 28, 2017, which would have been within the six months immediately prior to the effective date of the policy.  CMFG denied Russell's claim on March 21, 2018.

¶5     Russell initiated this case on August 31, 2020, and filed an amended summons and complaint the next day.  Russell alleged three causes of action: (1) reformation of the insurance contract; (2) payment of death benefits under the policy, including interest; and (3) return of excess premiums, also including interest.  The parties filed cross-motions for summary judgment.  Based on the briefing and the documents in the record, the circuit court granted CMFG's motion for summary judgment and denied Russell's motion, concluding that "[t]he policy language logically and reasonably excludes coverage for death caused by pre-existing conditions, which are reasonably defined in the policy."  The court entered an order dismissing Russell's complaint.  Russell appeals.

**DISCUSSION**

¶6 "We independently review a grant of summary judgment, using the same methodology as the circuit court." ***Ehr v. West Bend Mut. Ins. Co.***, 2018 WI App 14, ¶7, 380 Wis. 2d 138, 908 N.W.2d 486. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2021-22).[5] Where the circuit court's decision to grant or deny summary judgment rests on its interpretation of an insurance policy, which is a question of law, we review that decision de novo. ***Olson v. Farrar***, 2012 WI 3, ¶24, 338 Wis. 2d 215, 809 N.W.2d 1.

¶7 "Insurance policies are contracts, and they should be interpreted as such." ***Romero v. West Bend Mut. Ins. Co.***, 2016 WI App 59, ¶18, 371 Wis. 2d 478, 885 N.W.2d 591.

> Judicial interpretation of a contract, including an insurance policy, seeks to determine and give effect to the intent of the contracting parties. Insurance policies are construed as they would be understood by a reasonable person in the position of the insured. However, we do not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium.

***American Fam. Mut. Ins. Co. v. American Girl, Inc.***, 2004 WI 2, ¶23, 268 Wis. 2d 16, 673 N.W.2d 65 (citations omitted). "We give words used in [an

---

[5] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

insurance] policy their plain and ordinary meaning." ***Frank v. Wisconsin Mut. Ins. Co.***, 198 Wis. 2d 689, 694, 543 N.W.2d 535 (Ct. App. 1995). "When the terms are plain and unambiguous, we will construe the contract as it stands"; however, if the insurance policy is ambiguous, "the language will be construed in favor of coverage." ***Id.***

¶8      Our interpretation of an insurance policy occurs in three steps. First, we consider whether the policy's insuring agreement makes an initial grant of coverage for the insured's claim. ***American Girl***, 268 Wis. 2d 16, ¶24. If the policy makes an initial grant of coverage, we next consider whether any exclusions in the policy preclude coverage. ***Id.*** If we conclude that a particular exclusion applies, we then consider whether any exception to the exclusion reinstates coverage. ***Id.***

¶9      Here, the policy's insuring agreement makes an initial grant of coverage for Russell's claim. Pursuant to the policy terms, CMFG "will pay a life insurance benefit" in the event that the insured "incur[s] a covered life event while … insured with this coverage." Death of the insured is, by the plain language of the policy, a covered life event.[6] The parties do not assert anything to the contrary. Thus, there is an initial grant of coverage, and our focus then becomes whether any exclusions apply and, if so, whether any exceptions apply to those exclusions.

---

[6] Russell argues in her brief-in-chief that moving the tire was an accidental cause of Raymond's death. However, it does not appear, based on the plain language of the policy, that coverage under the policy is conditioned on an accidental occurrence. All deaths are covered under the policy, unless an exclusion applies. In other words, only the exclusion, and not the initial grant of coverage, is conditioned on death occurring or not occurring in any particular manner.

¶10     As noted above, the policy contains a specific exclusion for pre-existing conditions.  As relevant to this appeal, the exclusion provides:

> We will not pay benefits to cover an Advance if [the insured's] covered life event … occurs within 6 months after the Effective Date of Insurance on the Advance and results directly or indirectly from a Pre-Existing Condition. If [the insured's] covered life event occurs more than 6 months after the Effective Date of Insurance it will not be excluded from benefit payments based on the Pre-Existing Condition exclusion.

The policy defines a pre-existing condition as "an illness, disease, or medical condition for which [the insured] received medical advice, consultation, or treatment within the 6 month period immediately prior to the Effective Date of Insurance."

¶11     There is no question that Raymond's death occurred within six months following the effective date of the policy—Raymond died less than two months after he and Russell took out the policy.  Russell also does not appear to argue on appeal that Raymond's end-stage liver disease and his esophageal varices did not constitute pre-existing conditions.[7]  Thus, for the purpose of this decision, we will assume, without deciding, that these diagnoses were pre-existing conditions.  Therefore, the remaining question on appeal is whether Raymond's death resulted directly or indirectly from either, or both, of those pre-existing conditions.

---

[7] Russell did argue before the circuit court that these diagnoses did not satisfy the policy's definition of a pre-existing condition.  It appears, however, that she has abandoned that argument on appeal.  *See A.O. Smith Corp. v. Allstate Ins., Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the [circuit] court, but not raised on appeal, is deemed abandoned.").

¶12 We agree with CMFG that Raymond's death resulted at least indirectly from these pre-existing conditions. The affidavits of Raymond's physician support this conclusion. In one affidavit, Raymond's physician explained that "[t]he reference to 'Upper GI bleed, with end[-]stage liver disease'" in the "Health Care Provider's Statement" that he initially provided to CMFG

> means the end[-]stage liver disease is the cause of varices in the esophagus and stomach. These varices can burst if put under pressure. The upper [gastrointestinal] bleed is the result of varices bursting on September 21, 2017[,] by handling the 74[-]pound tire. This bleeding is the immediate cause of death. The end[-]stage liver disease did not cause the varices to burst on the day of death. It was lifting the tire that did.

In another affidavit, Raymond's physician opined that

> [i]f Raymond Russell did not have pre[-]existing bleeding and esophageal varices he would not have died [on] September 21, 2017[.] There is a combination of predisposition to hemorrhage with the mechanism of handling the 74.2[-]pound tire by him which combined to cause the hemorrhage that caused his death on September 21, 2017.

¶13 Russell also appears to concede the role that Raymond's pre-existing conditions played in his death. For example, in Russell's complaint, she stated "[t]hat handling the tire would not have resulted in [Raymond's] death if [he] did not have end[-]stage liver disease and esophageal varices" and that "[t]he convergence of overexertion and compromised varices concurrently caused the lethal hemorrhage." Thus, the record supports the conclusion that Raymond's pre-existing conditions were at least an indirect cause of his death, which brings Russell's claim within the terms of the pre-existing condition exclusion in the policy to preclude coverage of her claim.

8

¶14    Given that there are no exceptions to the pre-existing condition exclusion in the policy, our analysis could end here.  However, Russell seeks to meet her burden to establish coverage by applying the independent concurrent cause rule.[8]  This rule provides that "[w]here a policy expressly insures against loss caused by one risk but excludes loss caused by another risk, coverage is extended to a loss caused by the insured risk even though the excluded risk is a contributory cause." *Siebert v. Wisconsin Am. Mut. Ins. Co.*, 2011 WI 35, ¶40, 333 Wis. 2d 546, 797 N.W.2d 484 (alteration in original) (quoting *Kraemer Bros., Inc. v. United States Fire Ins. Co.*, 89 Wis. 2d 555, 570, 278 N.W.2d 857 (1979)).  According to our supreme court, "in order to trigger coverage, '[t]he independent concurrent cause must provide the basis for a cause of action in and of itself and must not require the occurrence of the excluded risk to make it actionable.'" *Id.* (alteration in original; citations omitted).  "Stated conversely, if the covered risk is not actionable without the occurrence of an excluded risk, then the covered risk is not sufficiently independent to trigger coverage under the policy." *Id.*

¶15    Russell argues that the independent concurrent cause rule requires a finding of coverage under the policy unless the pre-existing condition is the sole cause of death.  Initially, we note that Russell's arguments implicitly acknowledge that the independent concurrent cause rule has not been applied in this state in the context of a life insurance policy, as Russell states that she "is asking [that] the common law be construed to extend the [independent] concurrent cause [rule] to life insurance" and that "[t]his [c]ourt should include life insurance policies within

---

[8] Throughout her briefing, Russell refers to the "concurrent cause doctrine."  Based on our review of Wisconsin case law, courts typically refer to this doctrine as the "independent concurrent cause rule"; therefore, we will do so as well. *See Siebert v. Wisconsin Am. Mut. Ins. Co.*, 2011 WI 35, ¶40, 333 Wis. 2d 546, 797 N.W.2d 484.

the ambit of the [independent] concurrent cause [rule]." While Russell cites a number of cases in which the independent concurrent cause rule was applied, none of those cases involved life or credit life insurance. Russell has failed to present any legal authority for the proposition that, in Wisconsin, the independent concurrent cause rule applies in those contexts. Our independent research also failed to reveal any legal authority applying the rule in the context of a credit life insurance or life insurance claim.

¶16 Instead, Russell cites only a California Court of Appeals case in support of her argument that the independent concurrent cause rule should apply in the context of a credit life insurance policy. *See **Arata v. California-Western States Life Ins. Co.***, 123 Cal. Rptr. 631 (Cal. Ct. App. 1975). In ***Arata***, the court considered whether "double indemnity death benefits" were payable under a policy issued by the insurance company. ***Id.*** at 632. The policy provided benefits for death "as a result of accidental bodily injury, directly and independently of all other causes, within 90 days after the date of injury," but it also stated that the benefits were not payable "if death … is contributed to by: '(1) disease or bodily or mental infirmity ….'" ***Id.*** The insured, who suffered from hemophilia, slipped and fell, which caused a subdural bleed that led to his death. ***Id.*** Despite the policy's exclusion, the court found that the insured died due to an accidental bodily injury and was entitled to double indemnity death benefits. ***Id.*** at 634. Applying a California Supreme Court case, the court stated:

> [T]he presence of pre[-]existing disease or infirmity will not relieve the insurer from liability if the accident is the proximate cause of death.… [R]ecovery may be had even though a diseased or infirm condition appears to actually contribute to cause the death if the accident sets in progress the chain of events leading directly to death, or if it is the prime or moving cause.

10

*Id.* at 633 (alteration in original) (quoting ***Brooks v. Metropolitan Life Ins. Co.***, 163 P.2d 689, 691 (Cal. 1945)).

¶17 We refuse Russell's request to extend the application of the independent concurrent cause rule in Wisconsin by applying the ***Arata*** holding in this case. We are not bound by a California court's conclusion on an issue of law. At best, we may consider it persuasive authority. *See* ***State v. Frey***, 178 Wis. 2d 729, 740, 505 N.W.2d 786 (Ct. App. 1993).

¶18 In addition, we decline to apply the ***Arata*** holding for at least two reasons. First, ***Arata*** does not involve the type of credit life insurance at issue in this case. Second, we are not convinced that the rule would apply in the present situation. As noted above, in this state, "in order to trigger coverage, '[t]he independent concurrent cause must provide the basis for a cause of action in and of itself and must not require the occurrence of the excluded risk to make it actionable.'" ***Siebert***, 333 Wis. 2d 546, ¶40 (alteration in original; citations omitted); *see also* ***Varda v. Acuity***, 2005 WI App 167, ¶24, 284 Wis. 2d 552, 702 N.W.2d 65.

¶19 Here, it is undisputed that the loss covered by the policy—Raymond's death—would not have occurred absent Raymond's pre-existing conditions. In reply, Russell seems to argue that the independent concurrent cause rule should nevertheless apply because someone could presumably die from lifting a tire alone. *Cf.* ***Stoffel v. American Fam. Life Ins. Co.***, 41 Wis. 2d 565, 574-75, 164 N.W.2d 484 (1969) (affirming a finding of coverage where evidence showed that lifting a wagon itself "probably" caused the insured's death); ***Herthel v. Time Ins. Co.***, 221 Wis. 208, 210, 214, 265 N.W. 575 (1936) (concluding that pulling a boat onto shore would not have resulted in injury except for pre-existing heart

condition). However, that argument ignores the facts of this particular case. It is undisputed that Raymond's act of lifting the tire—alone—did not cause his death. Raymond's physician's affidavit states that *both* lifting the tire *and* Raymond's pre-existing conditions combined to cause his death, but it also states that Raymond likely would not have died from lifting the tire but for his pre-existing conditions. Thus, because the facts in this particular case demonstrate that lifting the tire would not have caused Raymond's death independent of his pre-existing conditions, the independent concurrent cause rule would not apply here even if we were to extend the rule to credit life insurance policies.[9]

¶20 Russell next argues that the application of WIS. ADMIN. CODE § Ins 3.25(14)(e)1. (July 2020),[10] along with the independent concurrent cause rule, creates an ambiguity.[11] Section Ins 3.25 addresses credit life insurance and credit accident and sickness insurance. In particular, § Ins 3.25(14)(e)1. provides, in pertinent part:

> For initial amounts of credit life insurance in excess of $15,000, if evidence of individual insurability is not required, the policy shall contain no exclusion for pre-existing conditions except for those conditions which manifested themselves to the insured debtor by requiring medical advice, diagnosis, consultation or treatment, or

---

[9] Given our conclusion, we do not address Russell's additional argument that coverage is required because CMFG could have, but did not, include "anti-concurrent cause" language in the policy.

[10] All references to WIS. ADMIN. CODE § Ins 3.25 are to the July 2020 register.

[11] CMFG notes that before the circuit court, Russell argued that she was entitled to "reformation" because the pre-existing condition exclusion is inconsistent with WIS. ADMIN. CODE § Ins 3.25(14)(e)1. Reformation is an equitable remedy that exists to effectuate the parties' intentions at the time they entered into a contract. *Krause v. Hartwig*, 14 Wis. 2d 281, 284, 111 N.W.2d 138 (1961). In her briefing before this court, it does not appear that Russell continues to seek reformation of the policy. Thus, we address the issue no further. *See A.O. Smith Corp.*, 222 Wis. 2d at 491.

would have caused a reasonably prudent person to have sought medical advice, diagnosis, consultation or treatment, within 6 months preceding the effective date of coverage and which causes loss within 6 months following the effective date of coverage.

Sec. Ins 3.25(14)(e)1. Russell argues that § Ins 3.25(14)(e)1. "should be liberally construed to achieve its purpose of prohibiting pre-existing condition clauses." Likewise, Russell asserts that § Ins 3.25(14)(e)1. "[s]hould be construed in conformity with *Arata*" because that code section "would not include [a] concurrent cause if this [c]ourt adopts *Arata*." Specifically, Russell argues that by excluding coverage for death resulting "directly or indirectly" from a pre-existing condition, the policy violates the regulatory requirement that this exclusion be limited to any condition which "causes loss" within six months of the effective date of coverage.

¶21 First, as noted above, the independent concurrent cause rule is not applicable under the circumstances of this case. Accordingly, there is no legal basis for us to find that the independent concurrent cause rule renders WIS. ADMIN. CODE § Ins 3.25(14)(e)1. ambiguous or that we should construe it in conformity with the California court's holding in *Arata*.

¶22 Second, Russell argues that WIS. ADMIN. CODE § Ins 3.25(14)(e)1. is ambiguous because the phrase "which causes loss" in the code section "does not have a precise meaning as 'cause' can be the sole or a partial cause." We agree with CMFG, however, that § Ins 3.25(14)(e)1. does not state that a policy provision may only exclude coverage for deaths *directly or solely* caused by a

pre-existing condition.[12]  As Russell suggests, "causes loss" can mean "the sole or a partial cause"; that fact does not make the pre-existing condition exclusion ambiguous, just broader than Russell would like.  CMFG's policy language excluding coverage for death resulting "directly or indirectly from a Pre-Existing Condition" does not violate the express terms of the regulatory requirement.

¶23  Finally, along these same lines, Russell asserts that the phrase "results … from" in the policy is ambiguous.  "Insurance policy language is ambiguous 'if it is susceptible to more than one reasonable interpretation.'" *Folkman v. Quamme*, 2003 WI 116, ¶13, 264 Wis. 2d 617, 665 N.W.2d 857 (citation omitted).  According to Russell, "[t]he aspect 'results … from' can either mean death must solely result from the pre-existing condition, or the pre-existing condition need only be a contributing factor or partial cause of [Raymond's] death."  We reject Russell's arguments in this regard.

¶24  Russell is cherry-picking words from the policy to create ambiguity and fails to read the policy language in its entirety.  The policy does not simply say "results from"; it states "results directly or indirectly from a Pre-Existing Condition."  Thus, it is clear that the policy excludes coverage both where the death directly results from a pre-existing condition *and* where the pre-existing condition is an indirect contributing factor.  The terms "directly" and "indirectly" clarify the phrase "results from" and remove Russell's manufactured ambiguity. The cases that Russell cites in support of her position do not persuade us

---

[12] CMFG argues that it submitted the forms for the policy to the Wisconsin Office of the Commissioner of Insurance (OCI) for review and approval and that we "must afford due weight to OCI's determination" to approve the forms.  We need not address this argument because, even applying de novo review, we conclude that the pre-existing condition exclusion in the policy is not in conflict with WIS. ADMIN. CODE § Ins 3.25(14)(e)1.

otherwise. *See* ***Olson***, 338 Wis. 2d 215, ¶53 (concluding that the phrase "results from," which was devoid of any clarifying language, was ambiguous because "the phrase could be interpreted narrowly to mean the cause of the property damage, [but] it could just as easily be interpreted to encompass any factor that contributed to the property damage"); ***Burrage v. United States***, 571 U.S. 204, 206 (2014) (addressing "results from," again without any additional clarifying language, when used in the context of the Controlled Substances Act—a federal, criminal statute— to determine "whether the mandatory-minimum provision applies when use of a covered drug supplied by the defendant contributes to, but is not a but-for cause of, the victim's death or injury").

¶25 Russell also appears to argue that the alleged ambiguity in the policy language renders her coverage illusory because "it is not feasible for the insured to prove lifting the tire was the predominant cause of death" and "[n]either side is in a position to say what factor—overexertion or compromised varices—is primarily responsible for this death." This argument is meritless. "Coverage is illusory only when we cannot foresee liability in any imaginable set of circumstances." ***Baumann v. Elliott***, 2005 WI App 186, ¶20, 286 Wis. 2d 667, 704 N.W.2d 361. On the contrary, here we can foresee liability in a myriad of circumstances.

¶26 Coverage under CMFG's policy provides coverage for all deaths, subject to only two narrow exclusions: (1) death as a result of suicide within twelve months after the effective date of the policy; and (2) death that results directly or indirectly from a pre-existing condition within six months after the effective date of the policy. The pre-existing condition exclusion is narrowed even further by the policy's definition of a pre-existing condition, which requires that the condition be "an illness, disease, or medical condition for which [the insured] received medical advice, consultation, or treatment within the 6 month

period immediately prior to the Effective Date of Insurance." As CMFG argues, even under the broadest interpretation of "directly or indirectly," the policy would still cover deaths that occur more than six months after the policy's effective date, deaths that occur from unrelated causes, and deaths resulting from a condition for which the insured had not received medical advice, consultation, or treatment in the six months before the effective date. Further, Russell's argument that the policy's coverage is illusory appears to be based entirely on her arguments related to the independent concurrent cause rule, which, as we have explained, does not apply.

¶27 In this case, it is undisputed that the covered loss—Raymond's death—was caused at least indirectly by his pre-existing medical conditions. Therefore, the circuit court properly concluded that there is no coverage for Raymond's death under the policy and that CMFG does not owe Russell any benefits.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.